**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

RILEY BRIONES, JR., AKA Unknown Spitz,

*Defendant-Appellant.*

No. 16-10150

D.C. No.
2:96-cr-00464-DLR-4

OPINION

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted En Banc March 27, 2019
San Francisco, California

Filed July 9, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P. Graber, M. Margaret McKeown, Kim McLane Wardlaw, Marsha S. Berzon, Milan D. Smith, Jr., Sandra S. Ikuta, Morgan Christen, Jacqueline H. Nguyen, Mark J. Bennett, and Ryan D. Nelson, Circuit Judges.

Opinion by Judge Christen;
Dissent by Judge Bennett

## SUMMARY[*]

### Criminal Law

The en banc court vacated a sentence of life without the possibility of parole (LWOP), which the district court reimposed at resentencing after having granted the defendant's 28 U.S.C. § 2255 motion following the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012); and remanded for consideration of the entirety of the defendant's sentencing evidence.

In 1997, the defendant received a mandatory LWOP sentence for his role, at age 17, in a robbery that resulted in murder.

The en banc court held that the district court's analysis at resentencing was inconsistent with the constitutional principles set forth in *Miller*, which held that mandatory LWOP sentences for juvenile offenders violate the Eighth Amendment's prohibition on cruel and unusual punishment, and subsequent case law, including *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), which specified that an LWOP sentence is constitutionally permissible only for "the rarest of juvenile offenders"—specifically, those whose "crimes reflect permanent incorrigibility" and "irreparable corruption."

The en banc court wrote that when courts consider *Miller*'s central inquiry, they must reorient the sentencing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history. Based on the district court's articulated reasoning at resentencing, the en banc court could not tell whether the district court appropriately considered the relevant evidence of the defendant's youth or the evidence of his post-incarceration efforts at rehabilitation. The en banc court observed that the district court's remarks focused on the punishment warranted by the terrible crime, rather than whether the defendant was irredeemable; and that the district court's statement that it considered some factors in "mitigation" suggests that the district court applied the Sentencing Guidelines and improperly began with a presumption that LWOP would be appropriate.

The en banc court deemed most significant that the defendant offered abundant evidence that he was not irreparably corrupt or irredeemable because he had done what he could to improve himself within the confines of incarceration. The en banc court wrote that the eighteen years that passed between the original sentencing and the resentencing – including the first fifteen years during which defendant's LWOP sentence left no hope that he would ever be released – provide a compelling reason to credit the sincerity of his efforts to rehabilitate himself. The en banc court wrote that this is precisely the sort of evidence of capacity for change that is key to determine whether a defendant is *permanently* incorrigible, yet the record does not show that the district court considered it. The en banc court reaffirmed that when a substantial delay occurs between a defendant's initial crime and later sentencing, the defendant's post-incarceration conduct is especially pertinent to a *Miller* analysis. The en banc court concluded that the heavy

emphasis on the defendant's crime, coupled with the defendant's evidence that his is not one of those rare and uncommon cases for which LWOP is a constitutionally acceptable sentence, requires remand.

Dissenting, Judge Bennett, joined by Judge Ikuta, wrote that the district court fully complied with *Miller*, did not commit any constitutional error, and imposed a permissible sentence supported by the record.

## COUNSEL

Easha Anand (argued), Orrick Herrington & Sutcliffe LLP, San Francisco, California; Vikki M. Liles (argued), The Law Office of Vikki M. Liles P.L.C., Phoenix, Arizona; Melanie L. Bostwick, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; for Defendant-Appellant.

Krissa M. Lanham (argued) and Patrick J. Schneider , Assistant United States Attorneys; Elizabeth A. Strange, First Assistant United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

John R. Mills and Scott P. Wallace, Phillips Black Inc., San Francisco, California; Robin Wechkin, Sidley Austin LLP, Seattle, Washington; Ronald Sullivan, Fair Punishment Project, Cambridge, Massachusetts; for Amici Curiae National Association of Criminal Defense Lawyers, ACLU, Fair Punishment Project, Juvenile Law Center, Roderick and Solange MacArthur Justice Center, Alaska Association of Criminal Defense Lawyers, Arizona Attorneys for Criminal Justice, California Attorneys for Criminal Justice, Hawaii Association of Criminal Defense Lawyers, Idaho Association

of Criminal Defense Lawyers, Montana Association of Criminal Defense Lawyers, Nevada Attorneys for Criminal Justice, Oregon Criminal Defense Lawyer's Association, and Washington Association of Criminal Defense Lawyers.

William H. Milliken and Michael E. Joffre, Sterne Kessler Goldstein & Fox PLLC, Washington, D.C., for Amici Curiae Professors Douglas A. Berman, William W. Berry, Jenny E. Carroll, Cara H. Drinan, Alison Flaum, Shobha L. Mahadev, Sarah French Russell, and Kimberly Thomas.

Keith J. Hilzendeger, Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

## OPINION

CHRISTEN, Circuit Judge:

In 1997, Riley Briones, Jr. received a mandatory sentence of life without the possibility of parole (LWOP) for his role in a robbery that resulted in murder. Briones was 17 years old at the time of the crime. In 2012, the Supreme Court held that mandatory LWOP sentences for juvenile offenders violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Miller v. Alabama*, 567 U.S. 460, 465 (2012). After the *Miller* decision issued, Briones filed a motion pursuant to 28 U.S.C. § 2255 seeking to have his sentence vacated. The district court granted the motion, held a second sentencing hearing, and reimposed the original sentence. Because the district court's analysis was inconsistent with the constitutional principles the Supreme

Court delineated in *Miller* and subsequent case law, we vacate Briones's sentence and remand to the district court.

## I.  Background

Briones grew up on the Salt River Indian Reservation in Arizona.  As a child, Briones endured physical abuse from his father, Riley Briones, Sr., and was introduced to drugs and alcohol at age 11.  Briones was a fairly good student and he aspired to attend college.  After he and his girlfriend had a child while still in high school, however, he dropped out to take a full-time position in an apprentice program, training to be a heavy equipment operator.

Briones, his father, and his brother Ricardo founded a gang called the Eastside Crips Rolling 30's.  While still a teenager, Briones planned and participated in a number of violent, gang-related crimes on the Reservation.  The most serious of these crimes was the robbery of a Subway restaurant in May 1994, when Briones was seventeen years old.  Although Ricardo came up with the idea, Briones agreed to the plan and drove four of the gang's members to the restaurant to carry it out.  Briones remained in the car as the getaway driver while the others went inside and ordered food from the lone employee, Brian Lindsey.  As the food was being prepared, the only armed member of the cohort left the restaurant, spoke to Briones, then reentered the store and shot Lindsey as he stood at the front counter, killing him.  The gang members grabbed their food and a bag of money and ran back to Briones's car.

Briones was arrested on December 21, 1995.  He was charged with "first degree/felony murder" for the Subway robbery, and also charged with arson, assault, and witness

tampering because of other gang-related offenses. Briones's father and brother were among the five co-defendants. The government extended pre-trial plea offers of twenty years in prison to all five defendants, but Briones's father was "adamant" that neither he nor either of his sons should accept the deal. Briones rejected the government's offer, went to trial, and was convicted on all charges. For the felony murder conviction, he was sentenced to a mandatory term of life imprisonment without the possibility of parole.[1]

In June of 2012, the Supreme Court issued its decision in *Miller* and held that the Eighth Amendment prohibits sentencing schemes that mandate life in prison without the possibility of parole for juvenile defendants. 567 U.S. at 479. *Miller* explained that sentencing courts must consider the unique social and psychological characteristics of juvenile offenders because "hallmark features" of youth reduce the penological justifications for imposing LWOP sentences on juveniles. *Id*. at 477–80. After *Miller* was decided, Briones filed a motion pursuant to 28 U.S.C. § 2255 seeking to have his sentence vacated. The government conceded that his

---

[1] The Presentence Report (PSR) reflects other very serious criminal conduct. It describes Briones providing Molotov cocktails for gang members to throw at the homes of rival gang members; planting diversionary fires to occupy the authorities; planning a shooting; covering up a separate drive-by shooting; assaulting a gang member who knew about the Subway murder; and discussing plans to blow up the Salt River Police Department and kill a tribal judge, federal prosecutors, and Salt River Police investigators. Briones has served all of the prison time imposed for his non-homicide crimes; the only sentence remaining is the LWOP sentence for the Subway robbery.

"mandatory life sentence [was] constitutionally flawed[,]"**[2]** and the district court granted Briones's motion.

Before Briones was resentenced, the Supreme Court issued *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), establishing that *Miller*'s substantive rule is to be given retroactive effect. *Id.* at 736. *Montgomery* also provided additional guidance about the proper application of *Miller* and specified that a sentence of life without the possibility of parole is constitutionally permissible only for "the rarest of juvenile offenders"—specifically, those whose "crimes reflect permanent incorrigibility" and "irreparable corruption." *Montgomery*, 136 S. Ct. at 734.

By the time the district court resentenced Briones in March 2016, he was almost forty years old and he had served nearly eighteen years in prison without a single infraction of prison rules. In addition to maintaining a perfect disciplinary record, Briones held a job in food service; volunteered to speak with young inmates about how to change their lives; completed his GED; and, in 1999 (sixteen years before his resentencing), married Carmelita, the woman he had been dating since high school and with whom he had a daughter. By all accounts, and as even the government conceded, Briones had been a model inmate.

Briones cited *Miller* extensively in the memorandum he filed in anticipation of the resentencing hearing, and he asked the district court to impose a sentence of 360 months in accordance with the factors identified in *Miller* and his extensive history of rehabilitative efforts. In his testimony at the resentencing hearing, Briones expressed "[g]rief, regret,

---

**[2]** *Briones v. United States*, No. 13-71056, Dkt. No. 11, at 2.

sorrow, pain, sufferings" for his crimes and for Lindsey's death. He described how he was haunted by his actions, and he apologized to his own family and to the victim's family. Briones's counsel argued that a life sentence would be "unconstitutional in violation of *Graham* and *Miller*," and that the presumption in Briones's case should be *against* a life sentence because *Miller* requires that LWOP be the exception rather than the rule. The government contended that Briones had not accepted responsibility because, when he was interviewed in advance of the second sentencing hearing, Briones contested some aspects of the PSR's description of his responsibilities in the gang. But Briones did not dispute the role he played in the Subway robbery and murder, even saying at one point in his testimony that it was "probably [his] fault" that the robbery was not called off.

The district court's sentencing remarks were quite brief; its justification for reimposing LWOP comprised less than two pages of transcript. The court considered the PSR and letters written on Briones's behalf, the parties' sentencing memoranda, the transcript of the previous sentencing hearing, and the victim questionnaire. The court began with the Sentencing Guidelines calculation—which yielded a life sentence—and then stated: "in mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and he's been a model inmate up to now." The district court acknowledged that "[a]ll indications are that defendant was bright and articulate" and that "he has improved himself while he's been in prison," but the court described Briones's role in the Subway robbery as "be[ing] the pillar of strength for the people involved to make sure they executed the plan." The court stated that "some

decisions have lifelong consequences" and reimposed a life sentence. Because there is no parole in the federal system, the parties agree that Briones's life sentence is effectively LWOP. *See Sentencing Reform Act of 1984*, Pub. L. No. 98-473, tit. II, §§ 218(a)(5), 235(a)(1), 98 Stat 1837, 2027, 2031.

## II. *Miller* and *Montgomery*

The Supreme Court held in *Miller* "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. *Miller* built on the Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 568–69 (2005), and *Graham v. Florida*, 560 U.S. 48, 75 (2010), which established that juvenile offenders are not eligible for capital sentences and that the Eighth Amendment precludes LWOP sentences for juveniles who commit non-homicide crimes. *Miller*, 567 U.S. at 470. These decisions reflect the understanding that "children are constitutionally different from adults for purposes of sentencing." *Id*. at 471.

*Miller* further develops these constitutional principles, requiring that, even when terribly serious and depraved crimes are at issue, courts "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. *Miller* identified several characteristics of youth: (1) difficulty appreciating risks; (2) inability to escape dysfunctional home environments; (3) susceptibility to familial and peer pressure; (4) inability to deal competently with law enforcement or the justice system; and (5) potential for rehabilitation. *Id*. at 477–78. The Court held that these factors must be considered to determine whether a juvenile offender may be sentenced to LWOP. See *id*. at 480 ("[W]e

*require* [the sentencing court] to take into account how children are different . . . ." (emphasis added)).

*Miller* explains why these factors change the sentencing calculation for juveniles. Youth lack maturity, and their underdeveloped sense of responsibility "lead[s] to recklessness, impulsivity, and heedless risk-taking"; juveniles are particularly vulnerable "'to negative influences and outside pressures,' including from their family and peers"; and youth "is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'" *Id.* at 471, 476 (quoting *Roper*, 543 U.S. at 569, and *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). The Eighth Amendment also requires consideration of the reality that some juveniles become trapped in particularly "brutal or dysfunctional" family situations over which they have no control, and that juveniles struggle to competently deal with the criminal justice system. *Id*. at 477–78. By virtue of their youth, juveniles also harbor greater rehabilitative potential. *Id*. at 478; *see also id*. at 471 ("[A] child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." (internal quotation marks and brackets omitted)).

These factors erode the justification for imposing LWOP sentences, even when juveniles commit terrible crimes. *Id*. at 472. The characteristics of youth lessen moral culpability and thereby reduce the rationale for retribution. *Id*. The same characteristics that render juveniles less culpable than adults also make them less likely to be dissuaded by potential punishment, thereby minimizing the potential deterrent effect of a life sentence. *Id*. And permanent incapacitation is less likely to be required to protect society because juvenile offenders are more likely to shed the problematic attributes of

youth as a result of ongoing neurological development. *Id*. at 472–73.**[3]** The characteristics of an individual juvenile offender will determine whether a crime reflects "transient immaturity" (in which case, an LWOP sentence for a juvenile is impermissible) or "*irreparable* corruption" (in which case an LWOP sentence for a juvenile is constitutionally permitted). *Id*. at 479–80 (emphasis added). As a result, the Court cautioned, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. at 479.

In *Montgomery*, the Supreme Court held that the rule announced in *Miller* is a substantive constitutional limitation on life sentences for crimes committed by juveniles, as well as a procedural requirement. 136 S. Ct. at 736. *Miller*'s "substantive holding" was that "life without parole is an excessive sentence for children whose crimes reflect transient immaturity," and its procedural component implementing the substantive rule requires "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors" in order to "separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at 735 (quoting *Miller*, 567 U.S. at 465). It is not enough for sentencing courts to consider a juvenile offender's age before imposing life without parole. The Eighth Amendment dictates that "sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption . . . .'" *Id.* (quoting *Miller*,

---

**[3]** The Court reaffirmed in *Miller* what it had previously observed in *Graham*, 560 U.S. at 68: there are physiological differences between adults and juveniles in the regions of the brain related to "impulse control, planning ahead, and risk avoidance[.]" *Miller*, 567 U.S. at 472 n.5 (internal quotation marks omitted).

567 U.S. at 479–80). *Montgomery* made clear that, after *Miller*, juvenile defendants who are not permanently incorrigible or irreparably corrupt are *constitutionally ineligible* for a sentence of life without parole. *See id*. ("*Miller* . . . rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth.").

*Miller* and *Montgomery* are fairly recent decisions, and there is relatively little case law addressing how to evaluate the post-incarceration conduct of juvenile offenders for purposes of *Miller*. Our decision in *United States v. Pete*, 819 F.3d 1121 (9th Cir. 2016), did provide some guidance, though we recognize it was not issued until after Briones's resentencing. In *Pete*, a juvenile offender who had been sentenced to LWOP was granted resentencing in light of *Miller*. *Id*. at 1126. To prepare for resentencing, the defendant sought funding to obtain a neuropsychological evaluation. *Id*. The district court concluded that the evaluation was unnecessary because the defendant had undergone a psychiatric evaluation ten years earlier, when he was originally sentenced. *Id*. at 1127. We held that the district court abused its discretion by denying the funding request because "the critical question under *Miller* was [the defendant's] capacity to change after he committed the crimes at the age of 16." *Id*. at 1133. A new evaluation may reflect changes in the defendant's maturity or emotional health, and "whether [the defendant] *has* changed in some fundamental way since that time, and in what respects, is surely key evidence." *Id*.

Taken together, *Miller*, *Montgomery*, and *Pete* make clear that a juvenile defendant who is capable of change or rehabilitation is not permanently incorrigible or irreparably

corrupt; that a juvenile who is not permanently incorrigible or irreparably corrupt is constitutionally ineligible for an LWOP sentence; and that a juvenile's conduct after being convicted and incarcerated is a critical component of the resentencing court's analysis.

## III.  Briones's Resentencing

We review the district court's factual findings for clear error, but "review de novo a claim that a sentence violates a defendant's constitutional rights." *United States v. Hunt*, 656 F.3d 906, 911 (9th Cir. 2011) (citing *United States v. Raygosa-Esparza*, 566 F.3d 852, 854 (9th Cir. 2009)). District courts' sentencing decisions are entitled to deference, *see*, *e.g.*, *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir.) (en banc), *cert. denied*, 138 S. Ct. 523 (2017), but this deference is not absolute.[4]

Here, the district court properly began by calculating Briones's Sentencing Guidelines range, which yielded a sentence of life without parole.  District courts must begin with the Guidelines calculation,[5] but they "may not presume

---

[4] *See Martinez-Lopez*, 864 F.3d at 1043 (reversal of sentence is appropriate "if the [district] court applied an incorrect legal rule"); *United States v. Meredith*, 685 F.3d 814, 818, 826–27 (9th Cir. 2012) (partially vacating a sentence because the district court failed to consider evidence presented at sentencing); *United States v. Staten*, 466 F.3d 708, 715–17 (9th Cir. 2006) (remanding for consideration of certain statutory factors and factual elements).

[5] We reject the suggestion advanced by Briones and certain amici that district courts should no longer begin with the Sentencing Guidelines in juvenile cases because doing so creates a presumption (or at least momentum) in favor of LWOP sentences that should be "rare" and "uncommon" after *Miller*.  The Supreme Court has long required that "a

that the Guidelines range is reasonable." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). After calculating the Guidelines range, sentencing courts next turn to the factors and considerations identified in 18 U.S.C. § 3553(a). *Id*. If LWOP is a possible sentence for a juvenile offender, then the totality of the evidence and the § 3553(a) factors inform *Miller*'s central inquiry: whether the defendant is one of the rare juvenile offenders who is irredeemable, or whether the defendant is capable of change. *Montgomery*, 136 S. Ct. at 734–36. We recognize that some tension exists between *Miller*'s mandate and the Sentencing Guidelines,**[6]** but *Miller* imposes a constitutional requirement. So where *Miller* is applicable, the Guidelines must be applied consistently with *Miller*'s rule.

We agree with the government that the severity of a defendant's crime is indisputably an important consideration

---

district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

**[6]** Briones's counsel argues that the Guidelines "generally forbid" consideration of several factors that may bear on a *Miller* analysis, such as U.S.S.G. § 5H1.1 (defendant's age), § 5H1.2 (education and vocational skills), § 5H1.3 (mental and emotional conditions), § 5H1.4 (physical condition), § 5H1.5 (employment record), § 5H1.6 (family ties and responsibilities), and § 5H1.10 (race, sex, national origin, creed, religion, and socio-economic status). But with the exception of § 5H1.10—which bars consideration of factors like race, sex, and national origin that are not relevant to *Miller*'s inquiry—the Guidelines actually provide that the factors Briones's counsel identified "may be relevant" or otherwise are simply "not *ordinarily* relevant." U.S.S.G. §§ 5H1.1–1.6 (emphasis added). Thus, the Guidelines are entirely compatible with *Miller*'s directive that courts consider a juvenile offender's youthful characteristics before taking the rare step of imposing an LWOP sentence.

in any sentencing decision. The severity of the crime is reflected in the Guidelines sentencing range calculation, which incorporates the nature of the offense, and in § 3553, which expressly includes consideration of the offense characteristics. 18 U.S.C. § 3553(a)(1)–(2). Nothing about *Miller* and *Montgomery*'s Eighth Amendment analysis minimizes the gravity of a juvenile defendant's criminal conduct; indeed, *Miller* and *Montgomery* also involved horrible crimes. *See Miller*, 567 U.S. at 465–68 (one petitioner participated in the murder of a video store clerk, and the other burned a neighbor's trailer with the neighbor inside); *Montgomery*, 136 S. Ct. at 725–26 (petitioner shot and killed a deputy sheriff).

Despite the harm caused by juveniles' criminal acts, *Miller* requires a sentencing analysis that accounts for the characteristics of youth that undermine the penological justification for lifelong punishment. *Miller*, 567 U.S. at 472; *see also Graham*, 560 U.S. at 68. This diminished justification for lifelong punishment is why LWOP sentences are "disproportionate for all but the rarest" juvenile offenders, *Montgomery*, 136 S. Ct. at 726, "even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Accordingly, when courts consider *Miller*'s central inquiry, they must reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history.

Based on the district court's articulated reasoning at Briones's resentencing, we cannot tell whether the district court appropriately considered the relevant evidence of Briones's youth or the evidence of his post-incarceration efforts at rehabilitation. The district court described

Briones's crime and his history of gang-related violence, identified certain factors it considered "in mitigation," and stated that "some decisions have lifelong consequences." In this way, the district court's sentencing remarks focused on the punishment warranted by the terrible crime Briones participated in, rather than whether Briones was irredeemable. The district court's statement that it considered some factors in "mitigation" suggests that the district court applied the Guidelines and began with a presumption that LWOP would be appropriate. As we have explained, however, a sentencing court may not presume the propriety of a Guidelines sentence, *see Carty*, 520 F.3d at 991, particularly in juvenile LWOP cases after *Miller*. Rather, the Constitution requires that the court consider a juvenile offender's youthful characteristics before taking the rare step of imposing an LWOP sentence.

Briones provided evidence related to a number of the *Miller* factors at the resentencing hearing, including his abusive upbringing,[7] his extensive exposure to drugs and alcohol beginning when he was only eleven years old,[8] his difficulty finding acceptance at his local high school because

---

[7] Despite his devotion to his father, Briones acknowledged during his resentencing testimony that his father beat him and whipped him when he was a child. On one occasion, he went to school with blood seeping through his shirt because of his father's abuse.

[8] The PSR recounted that Briones was drinking hard liquor on the weekends by the time he was eleven years old. Briones and his wife both testified that he consumed a substantial amount of alcohol on a daily basis as a child, and that even when Briones was young, his parents drank heavily and generally acceded to Briones's own heavy drinking.

of his Native American traditions,[9] and his father's inexplicable insistence that he reject the government's favorable plea offer even though Briones faced a mandatory LWOP sentence if convicted. Briones's lawyer also argued that Briones was somewhat less culpable because he was the getaway driver, not the shooter. *Id*. at 478. Most significant, Briones offered abundant evidence on the critical issue: that he was not irreparably corrupt or irredeemable because he had done what he could to improve himself within the confines of incarceration.

The eighteen years that passed between the original sentencing hearing and the resentencing hearing provide a compelling reason to credit the sincerity of Briones's efforts to rehabilitate himself. Briones was sentenced in 1997; *Miller* was not issued until 2012. Thus, for the first fifteen years of Briones's incarceration, his LWOP sentence left no hope that he would ever be released, so the only plausible motivation for his spotless prison record was improvement for improvement's sake. This is precisely the sort of evidence of capacity for change that is key to determining whether a defendant is *permanently* incorrigible, yet the record does not show that the district court considered it. This alone requires remand. *See Pete*, 819 F.3d at 1133.

The district court may have hesitated to fully consider Briones's post-incarceration conduct because we had not yet issued our decision in *Pete*, and because the government

---

[9] Briones's father told him of a distant relative who was "the last man to have his hair long[.]" Briones was moved by that account and let his hair grow long to "express his Native American identity." But when he tried out for the high school football team, the coach told him he could not be on the team unless he cut his hair.

argued that the court had to "make some guesses as to what Judge Broomfield would have done back [at Briones's original sentencing] had Judge Broomfield had the option of something other than a life sentence available to him." On this point, the government's argument missed the mark. *Pete* explained that "whether [the juvenile offender] *has* changed in some fundamental way since [the original sentencing], and in what respects, is surely key evidence." 819 F.3d at 1133. We reaffirm that when a substantial delay occurs between a defendant's initial crime and later sentencing, the defendant's post-incarceration conduct is especially pertinent to a *Miller* analysis. *See id.*; *see also Montgomery*, 136 S. Ct. at 736 ("The petitioner's submissions [of his reformation while in prison] are relevant . . . as an example of one kind of evidence that prisoners might use to demonstrate rehabilitation."). The key question is whether the defendant is capable of change. *See Pete*, 819 F.3d at 1133. If subsequent events effectively show that the defendant *has* changed or *is* capable of changing, LWOP is not an option.

The district court's heavy emphasis on the nature of Briones's crime, coupled with Briones's evidence that his is not one of those rare and uncommon cases for which LWOP is a constitutionally acceptable sentence, requires remand. We do not suggest the district court erred simply by failing to use any specific words, *see Montgomery*, 136 S. Ct. at 735, but the district court must explain its sentence sufficiently to permit meaningful review. *See Carty*, 520 F.3d at 992 ("Once the sentence is selected, the district court must explain it sufficiently to permit meaningful appellate review . . . . What constitutes a sufficient explanation will necessarily vary depending upon the complexity of the particular case . . . ."). When a district court sentences a juvenile offender in a case in which an LWOP sentence is possible, the record

must reflect that the court meaningfully engaged in *Miller*'s central inquiry.

## IV.  Conclusion

We vacate Briones's sentence and remand for consideration of the entirety of Briones's sentencing evidence.

**VACATED and REMANDED**.

---

BENNETT, Circuit Judge, with whom IKUTA, Circuit Judge, joins, dissenting:

I respectfully dissent.  The district court did not commit any constitutional error in imposing a life sentence, and I would therefore affirm.

## I.

Riley Briones, Jr. was a founder and leader of a vicious gang called the Eastside Crips Rolling 30's.  Briones helped plan and carry out a series of violent crimes committed by the gang on the Salt River Indian Reservation in 1994 and 1995. Briones's most serious crime, committed less than one month before his eighteenth birthday, was the planned robbery and murder of a Subway employee.[1]

---

[1] As the district judge stated at the sentencing at issue in this case: "The murder of the [Subway] clerk was planned.  It wasn't an accident, it wasn't unexpected."

On May 15, 1994, Briones drove four other gang members, one armed with a gun, to the Subway restaurant and waited in the vehicle while the others entered the restaurant. Prior to the murder, the gunman returned to the car and conferred with Briones, then returned to the restaurant and shot the employee in the face, and then shot him several more times as he lay injured or dying on the floor.[2] The conspirators stole a bank bag containing $100 (plus the food that they had ordered). One testified that after they returned to the car with the proceeds, Briones instructed another to grab a rifle from the backseat and shoot a maintenance worker who had been working in front of the Subway when they arrived. Though they searched for the worker to kill him as Briones had instructed, fortunately they did not find him.

Three weeks later—one day before Briones's eighteenth birthday—he and other gang members conspired to burn down the family residence of a rival gang member. Briones personally constructed the Molotov cocktails that another gang member used to firebomb the house. Luckily, the family inside—including a ten-year-old asleep on a couch—was not harmed.

Briones (now having reached the age of majority) and other gang members again decided to burn down the same rival gang member's home. Concerned that the fire department could thwart their plans, this time they decided to first start diversionary fires to lower the risk that the blaze at

---

[2] The district judge stated at sentencing: "I don't know what other conclusion can be drawn than that the defendant was involved in the final decision and encouraged the shooter to pull the trigger."

the targeted home would be prematurely contained.[3]  Briones drove other gang members to two abandoned buildings, where they started the diversionary fires.  With the first step of their scheme completed, Briones then drove his co-conspirators to their rival's home, which had survived the first firebombing.  Briones personally constructed the five Molotov cocktails that were used to start one of the diversionary fires and to firebomb the home, and he also provided the gasoline used to start the second diversionary fire.  Many people, of course, could have been killed, including two children inside the firebombed home.  Again, thankfully, no one was killed.

Attempt two having failed, Briones moved on to attempt three about a month later.  Briones helped plan a drive-by shooting of the same home.  Though Briones was neither the driver nor the shooter, he and another gang member went to Briones's home to pick up the assault rifle used in the shooting.  Afterward, Briones wiped the fingerprints off the assault rifle and directed other gang members to discard the shell casings and drop off the stolen car used in the shooting in an isolated place.  Again, those inside the home during the shooting were unharmed, though not due to any lack of trying by Briones.

In 1995, Briones violently assaulted a member of his gang in order to stop him from speaking to law enforcement about the Subway murder.  Briones broke a beer bottle on the victim's face and pistol-whipped his head.  The victim

---

[3] There is no evidence in the record that Briones or his co-conspirators were targeting the many families in nearby houses—their actual target lived in the firebombed home.  Neighbors were merely potential collateral damage.

testified at trial that Briones knocked him unconscious, and when he regained consciousness, he overheard Briones and others discussing "how they [were] going to dispose of [him]." That victim escaped and eventually cooperated.

At trial, the government presented evidence that the gang planned to blow up the Salt River Police Department and kill a tribal judge, federal prosecutors, and Salt River Police investigators. Briones and two others followed one investigator to lunch but did not shoot him because there were too many witnesses. The government also received information that at Briones's direction gang members practiced shooting at objects from a hilltop to simulate shooting from the roofs of buildings near the federal building. The government received information that while in jail, Briones carved gang graffiti into the door of a jail cell and discussed plans to escape.

Briones was convicted of all charged offenses, including felony murder, arson, assault, and witness tampering. At his original sentencing in July 1997, almost three years after the Subway murder, Briones continued to deny responsibility for his crimes. The district court sentenced Briones to the then-mandatory guidelines sentence of life imprisonment without parole on the felony murder count.[4]

Briones's original sentence was vacated in light of *Miller v. Alabama*, 567 U.S. 460 (2012). During resentencing, Briones argued that the sentencing guidelines, which recommend a life sentence in his case, should be set aside under *Miller*. He also argued that an appropriate sentence

---

[4] As noted by the majority, the only issue before us is Briones's sentence for his felony murder conviction. Maj. at 7 n.1.

would be 360 months "based on the evidence in mitigation" he would present, including relating to the "hallmarks of youth" identified by *Miller*.[5]

The resentencing record before the district court was comprehensive. It included the transcript of Briones's original sentencing, resentencing memoranda submitted by the parties, testimony from Briones and his wife at the resentencing hearing, arguments from counsel during the resentencing hearing, the presentence report (PSR)—which had been revised to include new information since Briones's incarceration—and letters on behalf of Briones and the victim questionnaires that were attached to the PSR. The district court adopted the findings in the PSR, and Briones made no objections to the PSR.

After considering all of the information in the record, the district court determined that a life without parole sentence was appropriate.

> [I]n mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and he's been a model inmate up to now.

---

[5] I question whether Briones appropriately raised the specific argument below that he now raises on appeal—that it would be constitutional error for the court to impose a life without parole sentence because his crimes do not reflect "permanent incorrigibility." I would affirm regardless.

However, some decisions have lifelong consequences. This robbery was planned, maybe not by the defendant but he took over and was all in once the plan was developed. He drove everybody there. He appeared to be the pillar of strength for the people involved to make sure they executed the plan. The murder of the clerk was planned. It wasn't an accident, it wasn't unexpected. Although the defendant did not pull the trigger, he was in the middle of the whole thing. He stayed in the car, apparently, to avoid responsibility.

And circumstantially, at least, it appears that defendant was involved in the final decision to kill the young clerk. Eschief came out to the car and spoke to him and walked right back in and shot him in the head. He spoke to the defendant right before he pulled the trigger. I don't know what other conclusion can be drawn than that the defendant was involved in the final decision and encouraged the shooter to pull the trigger.

All indications are that defendant was bright and articulate, he has improved himself while he's been in prison, but he was the leader of a gang that terrorized the Salt River Reservation community and surrounding area for several years. The gang was violent and cold-blooded.

Having considered those things and all the evidence I've heard today and everything I've

read, . . . it's the judgment of the Court that
[Briones] is hereby committed to the Bureau
of Prisons for a sentence of life.

## II.

### A.

Briones argues that, under *Miller*, the district court
committed constitutional error by imposing a life without
parole sentence.    We normally review "de novo the
constitutionality of a sentence." *United States v. Estrada-
Plata*, 57 F.3d 757, 762 (9th Cir. 1995).[6] Assuming de novo
review applies, I conclude that the district court did not
commit any constitutional error and imposed a permissible
sentence supported by the record.

### B.

The district court fully complied with the requirements in
*Miller*. The Court in *Miller* held that "the Eighth Amendment
forbids a sentencing scheme that mandates life in prison
without possibility of parole for juvenile offenders."
567 U.S. at 479. After analyzing its precedent, the Court
determined that a sentencer "must have the opportunity *to
consider* mitigating circumstances before imposing the

---

[6] If Briones failed to properly raise the specific constitutional
argument that he asserts on appeal, we would apply plain error review.
*See United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en
banc) (plain error review applies where an individual fails to raise the
constitutional error in the district court). "Plain error is '(1) error, (2) that
is plain, and (3) that affects substantial rights.'" *Id.* (quoting *United States
v. Cotton*, 535 U.S. 625, 631 (2002)). Because the district court did not
err at all, it obviously did not plainly err.

harshest possible penalty for juveniles." *Id.* at 489 (emphasis added). The Court then concluded that "[b]y requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes . . . violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." *Id.*

The Court noted, however, that a life sentence without the possibility of parole for juveniles in homicide cases *is* a permissible sentence. *Id.* at 480. And the Court offered explicit guidance on what is required to properly impose life sentences for juveniles: The Court's decision "*mandates only* that a sentencer follow a certain process—*considering* an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* at 483 (emphases added).

Consequently, *Miller* does not require a sentencer to make any explicit findings before imposing a life sentence on a defendant who was a juvenile at the time of the offense. *Miller* requires a sentencer to "consider," "examine," or "take into account how children are different." *Id.* at 480, 483, 489. The Court makes clear throughout its opinion that nothing more is required. *See, e.g.*, *id.* at 478–80 (explaining that "a sentencer *should look* at such facts," "a sentencer *needed to examine* all these circumstances," and "we require [a sentencer] to *take into account* how children are different" (emphases added)).

In *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Court clarified the requirements under *Miller*. There, the Court determined that "*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes

reflect permanent incorrigibility." *Id.* at 734. The Court ultimately held that "*Miller* announced a substantive rule that is retroactive in cases on collateral review." *Id.* at 732. But *Montgomery* did not bar life without parole sentences in murder cases and did not change what a sentencer must do before imposing such a sentence on a defendant who committed the murder as a juvenile. Indeed, *Montgomery* confirmed that there is no factfinding requirement before imposing such a sentence. *Id.* at 734–35.

In sum, *Miller*, as clarified by *Montgomery*, requires a sentencer "to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence," 136 S. Ct. at 734, and, if life without parole is imposed, it must be proportionate. That is, the circumstances must support that the juvenile offender's "crimes reflect permanent incorrigibility," *id.*, not "transient immaturity," *id.* at 735. Importantly, *Miller* does not require a sentencer to make findings that a juvenile offender is permanently incorrigible before imposing a life sentence without parole.

The district court here complied with *Miller*. First, there is no doubt that the district court was fully aware of *Miller*'s requirements. Indeed, *Miller* was the sole reason Briones was resentenced. The parties' memoranda cited *Miller* throughout. Briones's memorandum explicitly set forth the "hallmarks of youth" that the court must consider before imposing a life without parole sentence, and the government's memorandum, quoting *Miller*, highlighted that the court's task was to consider whether Briones's crimes reflect "unfortunate yet transient immaturity" or "irreparable corruption." And during the resentencing hearing, counsel

for both parties focused their arguments on *Miller*'s requirements.

   With the correct standards in mind, the district court did exactly what *Miller* requires—it considered Briones's "youth and attendant characteristics." 567 U.S. at 483. We know this because the district court explicitly stated that it considered Briones's "youth, immaturity, [and] adolescent brain at the time," and other evidence attendant to his youth, including "the history of [his] abusive father" and Briones's "constant abuse of alcohol and other drugs." We also know that the district court considered Briones's post-incarceration efforts at rehabilitation because the court expressly stated that Briones has "been a model inmate up to now" and "[Briones] has improved himself while he's been in prison." The district court further stated that it adopted the findings in the PSR, which contained information about Briones's youth and post-incarceration rehabilitation efforts. Thus, contrary to the majority's opinion, the district court very clearly considered Briones's youth, youth-related characteristics, and post-incarceration rehabilitation efforts.[7]

---

   [7] The majority criticizes the sentencing judge's remarks about Briones's crime and history of gang-related violence and his statement that "some decisions have lifelong consequences." Maj. at 16–17. The majority claims that these remarks demonstrate that the district court "focused on the punishment warranted by the terrible crime . . . rather than whether Briones was irredeemable." Maj. at 17. But the majority's conclusion completely ignores the sentencing judge's express statements that demonstrate he did in fact consider Briones's post-incarceration efforts at rehabilitation. The majority also criticizes the sentencing judge's remarks about factors he considered in mitigation. Maj. at 17. But the remarks made by the district court that the majority criticizes actually demonstrate that the district court considered proper information. *See Miller*, 567 U.S. at 489 ("[A] judge or jury must have the opportunity to consider *mitigating circumstances* before imposing the harshest

The district court therefore was aware of and applied the appropriate standards announced in *Miller*. The record also supports that the district court imposed a permissible sentence. The district court found that Briones was a founding member and leader of an extraordinarily violent gang.[8] The robbery and murder of the Subway employee was planned and brutal. Although Briones did not pull the trigger, as the district court found, he "was involved in the final decision [to kill the employee] and encouraged the shooter to pull the trigger." Moreover, he was only twenty-three days shy of his eighteenth birthday when he participated in the murder and instructed his subordinates to murder a witness. And the day before his eighteenth birthday he firebombed a home without any regard for the death and damage it might cause. Even after he reached the age of majority, he risked wide-scale    death    and    destruction    through    another

---

possible penalty for juveniles.") (emphasis added); 18 U.S.C. § 3553(a) ("The court, in determining the particular sentence to be imposed, shall consider . . . the nature and circumstances of the offense and the history and characteristics of the defendant[.]"). Further, the district court's statement that "some decisions have lifelong consequences" is entirely consistent with and necessarily follows from *Miller*, as *Miller* recognized that life without parole remains a permissible sentence for some juvenile offenders. 567 U.S. at 480. Thus, some crimes committed by some juveniles *will* have lifelong consequences.

[8] The district court described the gang as "violent and cold-blooded." Several of Briones's co-defendants were convicted of conspiracy to participate in a racketeering enterprise, i.e., the Eastside Crips Rolling 30's gang. The indictment described the gang as a "criminal organization" that "engaged in acts of violence, including murder, attempted murder, assault, arson, robbery, and intimidation of witnesses." Prospective gang members had to "carry out a violent act to prove [their] worth," and there was a group within the gang known as the "Skins Killing Slobs" or "Dark Army," whose job was to "assassinate anyone who posed a risk" to the gang.

firebombing, a drive-by shooting, and gang leadership. Many could have died from his actions—only one was proven to have.

Though Briones had the opportunity to express remorse at his original sentencing three years after the murder, he continued to deny responsibility for his crimes. During the resentencing hearing, government counsel stated that he had met with Briones *the day before the hearing*—almost twenty-two years after the murder—and even then Briones failed to accept responsibility and minimized his role in the murder and within the gang. When Briones testified at his resentencing hearing, he still maintained that he was "surprised" when he heard the gunshots that killed the Subway employee, and still denied that he was a leader in the gang. The district court's factual findings to the contrary were not clearly erroneous. When deciding to impose a sentence of life without parole, the district court expressly stated that it considered this information: "Having considered . . . all the evidence I've heard today [during the resentencing hearing] and everything I've read . . . [Briones] is hereby committed to the Bureau of Prisons for a sentence of life." As there is no requirement under *Miller* that the district court make any specific findings before imposing a life without parole sentence, there is no error here—constitutional, plain, or otherwise.

Thus, despite evidence of Briones's rehabilitation, youth when the heinous crimes were committed, and youth-related characteristics, the record supports that Briones's crimes reflect permanent incorrigibility, as opposed to transient immaturity. The district court therefore imposed a permissible sentence. Notably, the majority does not conclude that a life without parole sentence is impermissible

in this case.  Instead, although the majority claims otherwise, the majority's opinion vacates the district court's sentence because the district court failed to find that Briones was permanently incorrigible.  But as discussed above, there is no requirement for the district court to make any specific findings before imposing a life without parole sentence.  In short, the majority, citing *Montgomery*, states that it "do[es] not suggest the district court erred simply by failing to use any specific words," Maj. at 19.  But in clear contravention of *Montgomery*, that is precisely why it has reversed.  We remand for the district court to do again what it has already done.

Because the district court complied with *Miller*'s requirements and imposed a permissible sentence supported by the record, I would affirm.