**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51511-3-II |
| Respondent, | |
| v. | |
| DAKOTA MIKALLE COLLINS, | UNPUBLISHED OPINION ON REMAND |
| Appellant. | |

GLASGOW, J.—Dakota Mikalle Collins was 16 years old when he shot and killed Lorenzo Parks after Collins and some friends attempted to rob Parks. Collins was charged as an adult, and he pleaded guilty to second degree murder with a firearm enhancement, attempted first degree robbery, and two counts of second degree unlawful possession of a firearm. He requested an exceptional mitigated sentence below the standard range based on his youth and the circumstances of his childhood. The trial court denied Collins's request and imposed a standard range sentence.

On appeal to this court, Collins challenged his sentence, arguing that the trial court failed to fully and meaningfully consider his youth as a mitigating factor. We held that the trial court did not abuse its discretion and affirmed Collins's sentence. *State v. Collins*, No. 51511-3, slip op. at 7 (Wash. Ct. App. Aug. 27, 2019) (unpublished), http://www.courts.wa.gov/opinions /pdf/515113.pdf (*Collins* I). Collins then petitioned the Washington Supreme Court for review. The Supreme Court granted Collins's petition and remanded for our reconsideration in light of *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020), which clarified that sentencing courts must fully and meaningfully consider on the record how the characteristics of youth may mitigate the culpability of a juvenile offender.

In light of *Delbosque*, we now reverse our prior holding regarding Collins's sentence and remand for the trial court to reconsider Collins's youth as a mitigating factor with the benefit of recent appellate decisions. We do not disturb our prior holdings affirming Collins's convictions and reversing the imposition of the criminal filing fee, the DNA collection fee, and the interest accrual provision, which must not be imposed upon resentencing.

## FACTS

When Collins was 16 years old, he and his friends attempted to rob Parks. Collins was armed. After the attempted robbery, one of Collins's friends said, "Shoot him, shoot him." 2 Verbatim Report of Proceedings (VRP) at 55; *see also* Clerk's Papers (CP) at 300. Collins shot and killed Parks. Collins was charged as an adult with second degree murder with a firearm enhancement, attempted first degree robbery, and two counts of second degree unlawful possession of a firearm. Collins pleaded guilty to these charges.

## I. COLLINS'S SENTENCING

Under the terms of Collins's guilty plea, the State agreed to recommend a standard range sentence of 200 months plus the 60-month firearm enhancement for the second degree murder conviction, while Collins could argue for a lower sentence, as low as 66 months.

Collins filed a sentencing memorandum arguing for an exceptional mitigated sentence of 96 months. Collins argued that his youth, combined with the circumstances of his upbringing, warranted an exceptional mitigated sentence below the standard range. Collins cited his diagnoses of attention deficit hyperactivity disorder and oppositional defiant disorder, as well as his biological mother's drug use during pregnancy. In addition, Collins suffers from posttraumatic stress disorder (PTSD) due to physical and psychological abuse he endured at a military academy when he was 12 years old. Collins also had a history of abusing drugs and alcohol in the time

preceding the shooting. In total, Collins provided the trial court with over 100 pages of argument and documentation supporting his request for an exceptional mitigated sentence.

At Collins's sentencing hearing, the trial court heard testimony from Parks's father, sister, brother, and sister-in-law about how the loss of Parks had impacted their family. The trial court also heard testimony from April A. Gerlock, Ph.D., a psychiatric nurse practitioner who evaluated Collins and diagnosed him with "moderate to severe, chronic PTSD." CP at 406. At the hearing, defense counsel asked Dr. Gerlock to explain how the PTSD "may have played a part in this incident." 2 VRP at 45. Dr. Gerlock testified that adolescent brains are less developed in the prefrontal cortex, the area responsible for exercising judgment and understanding consequences, and the prefrontal cortex is also "not as active for someone with PTSD." 2 VRP at 47. In addition, PTSD impairs the mid-brain, "the part of the brain that stores fear-based memories," and causes it to be "more reactive." 2 VRP at 46-47. Dr. Gerlock explained that "those pieces [Collins's adolescence and PTSD] together really compounded his situation in terms of how he perceived the events as they unfolded that night, perceived the situation as threatening, and responded in that reactive impulsive way with lethal violence." 2 VRP at 47. Dr. Gerlock also submitted a more detailed, 16-page report as an attachment to Collins's sentencing memorandum, which concluded, "Substance abuse treatment, trauma-informed therapies, and life skills are all critical for [Collins's] rehabilitation." CP at 409.

The trial court heard from Collins's biological mother, who shared her regrets that she used drugs heavily during her pregnancy, as well as her opinion that Collins "was not the same boy when he returned from the military school." 2 VRP at 49. The trial court then heard testimony from a Catholic Community Services counselor. The counselor started working with Collins prior to his offense, and she had been trying to get him "the most intensive services that the County

could provide." 2 VRP at 50-51. Collins was arrested before he could receive the benefit of these services, but the counselor described him as "very receptive to continu[ing] to work with [Catholic Community Services] and to really work on bettering himself." 2 VRP at 51. The counselor ended her testimony by stating, "I'm sure [Collins] will [take advantage of the programming available during his incarceration], because he's been very receptive to the support." *Id.*

Collins expressed his remorse to the court. He addressed Parks's family, saying, "I want you to know this: I promise you that with every breath and bone in my body, I will commit to changing my life and myself so that I will never put another family in the spot I have put yours in." 2 VRP at 71.

In making its oral ruling, the trial court first affirmed testimony from Parks's sister that "life is about choices" and repeated her example of Parks's son as someone who faced "difficulties" but "made different choices in his life, and so now he's at a university on a scholarship." 2 VRP at 72. The trial court continued, "You know, we have a lot of people, unfortunately, in our society who have mothers who use drugs while they're pregnant, who have terrible things happen to them, being abused or whatever, as they're children." *Id.* According to the trial court, "we need to do more as a society to address those problems and give support to youth, but that's not what this proceeding today is about. . . . This is about accountability under the law for actions that you took." 2 VRP at 72-73. Addressing Collins, the trial court said, "You were previously convicted of a felony offense as a juvenile, which prevents you from having a firearm in any event. So despite the things that were being done for you or with you, you made very bad choices, and continued to make very bad choices." 2 VRP at 74.

The court described Dr. Gerlock's report as "very interesting" before concluding, "I don't know. I don't think [Dr. Gerlock] knows. I think that's why she phrased it [as] what you may have

been experiencing at that time. But the facts as they sound to me don't sound like a person who was in fear for their life." *Id.*

Addressing Collins's youth, the trial court agreed with the State that "nothing miraculous happens on your 18th birthday. You don't suddenly have your brain fully developed so that you're now going to make good choices and now going to be able to assess risks and consequences of your behavior differently than you did the day before you turned 18." 2 VRP at 75. Looking to the specific facts of this case, the trial court told Collins, "I suspect that you actually did have a good appreciation [of risks and consequences] when you had a gun in your hand, a loaded gun in your hand, and took the magazine out and put it back in." *Id.* The trial court concluded that Collins likely "had an appreciation for the risk associated with that gun and what would happen if you pulled the trigger." 2 VRP at 75-76.

In reviewing the circumstances of Collins's childhood, the trial court commented, "[A]s a human being and as a mother, it's very sad to read the packet of materials that [defense counsel] gave me . . . . It's very sad that you were exposed to drugs before you even had a chance at a life. It's very sad that you suffered at that academy." 2 VRP at 76. The trial court assured Collins, "I want you to know that I appreciate the materials that [defense counsel] has put forward, and that has given me -- that I've given a great deal of thought to that." *Id.*

Throughout its ruling, the trial court referenced *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), and recognized its discretion to impose an exceptional mitigated sentence based on Collins's youth:

> I agree with [defense counsel] that I don't think the *Houston-Sconiers* or the line of cases leading up to it supports the idea that if the State amends the charges or recommends something below the high end of the range, that that's taking into consideration youth and age and all of those things that [*Houston-Sconiers*] talks about. But I do think that the Court isn't going to ignore that, because clearly I would have expected that that's part of what was taken into consideration by the

5

State. But I believe that the Court shouldn't defer to the State and assume that they did that, but do its own assessment of that.

I do think there's a significant difference factually between *Houston-Sconiers* and this case, as well as the punishment. And there, I do think it was a situation where, thankfully, no one was killed, but it was a piling-on of consecutive sentencing enhancements that I think that even the judge in that case felt duty-bound to follow, and yet that it was at a very extreme sentence. That's not this case.

. . . .

I do think that *Houston-Sconiers* requires the Court to consider all of the factors, not just the act itself. But it can't -- it's like, okay, how do you consider immaturity or failure to appreciate risks and consequences. You don't consider those in a vacuum. You consider them in the context of what brings us all here today, and that is that you chose to pull the trigger, and a person died as a result.

. . . .

And to Mr. Collins, considering all of these factors, including all of the goals of sentencing that I've already touched on, of what is a just punishment, what will be a deterrent, what would it take to rehabilitate you -- which I honestly didn't hear a lot about -- and how do we protect the public, I do think a sentence within the standard sentencing range is appropriate, plus the firearm sentencing enhancement and a period of community custody.

2 VRP at 74-77. The trial court concluded by telling Collins that it hoped he would take advantage of programming available during his incarceration. The trial court advised Collins, "You certainly will still have a lot of life left when you finish this sentence where you could make a difference. You could change. You could become a contributing member of society. But again, that's one of those choices that you need to make." 2 VRP at 77.

The trial court denied Collins's request for an exceptional mitigated sentence and imposed the State's recommended standard range sentence of 260 months for the second degree murder, including the firearm enhancement. The sentences for the rest of the convictions would be served concurrently, so the total term of confinement imposed was 260 months.

II. COLLINS'S APPEAL

Collins appealed his convictions and sentence to this court, arguing that the automatic decline of juvenile court jurisdiction violated his right to due process and that the trial court failed to adequately consider his youth as a mitigating factor when sentencing him. *Collins* I, No 51511-3-II, slip op. at 1. Collins also appealed the imposition of certain legal financial obligations. *Id.* We affirmed Collins's convictions and sentence and reversed the imposition of certain legal financial obligations. *Id.* at 2.

Collins then petitioned for review to the Supreme Court, which granted his petition and remanded "for reconsideration in light of Supreme Court No. 96709-1 – *State of Washington v. Cristian Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020)." *State v. Collins*, 195 Wn.2d 1018, 464 P.3d 208 (2020). In *Delbosque*, 195 Wn.2d at 110-11, the Supreme Court elaborated on how sentencing courts should meaningfully consider youth in the context of *Miller*[1]-fix resentencing, but many of those considerations are the same or similar to the considerations mandated under *Houston-Sconiers*. We now reconsider Collins's appeal of his sentence in light of *Delbosque*.

ANALYSIS

YOUTH AS A MITIGATING FACTOR

A.    Trial Court Discretion

Generally, under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, trial courts must impose sentences within the standard range. RCW 9.94A.505(2)(a)(i). However, "[b]ecause 'children are different' under the Eighth Amendment and hence 'criminal procedure laws' must take the defendants' youthfulness into account, sentencing courts must have absolute discretion to depart as far as they want below otherwise applicable SRA ranges . . . when

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

sentencing juveniles in adult court." *Houston-Sconiers*, 188 Wn.2d at 9; *see also State v. O'Dell*, 183 Wn.2d 680, 695-96, 358 P.3d 359 (2015) (holding that a defendant's youthfulness may support an exceptional sentence below the standard range "in light of what we know today about adolescents' cognitive and emotional development"). The trial court has broad discretion to impose an appropriate sentence, and it also has "an affirmative duty to ensure that proper consideration is given to the juvenile's 'chronological age and its hallmark features.'" *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017) (quoting *Miller*, 567 U.S. at 477). If the trial court has not adequately considered the factors enumerated in *Houston-Sconiers*, then we must remand for resentencing. 188 Wn.2d at 23; *State v. Solis-Diaz*, 194 Wn. App. 129, 138-39, 376 P.3d 458 (2016), *rev'd in part on other grounds*, 187 Wn.2d 535, 387 P.3d 703 (2017).

B.      *Miller* Hearings and Ordinary Juvenile Sentencing Hearings

In *Delbosque*, the Supreme Court expanded upon existing case law that informs how sentencing courts consider the influence of youth "in the context of *Miller*-fix resentencing." 195 Wn.2d at 111 (footnote omitted). Delbosque was resentenced pursuant to the *Miller*-fix statute, specifically RCW 10.95.035(1). *Id.* at 112. Under the *Miller*-fix statute, the sentencing court must take into account specific statutory factors, including "'the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.'" *Id.* at 115 (quoting RCW 10.95.030(3)(b)).

In Collins's case, judicial discretion is guided by *Houston-Sconiers*, which held that "sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of *any* juvenile defendant." 188 Wn.2d at 21 (emphasis added). The *Houston-Sconiers* court required consideration of three factors when sentencing any juvenile: (1) the mitigating circumstances of youth, including the juvenile's "'immaturity, impetuosity, and failure

to appreciate risks and consequences;'" (2) the juvenile's environment and family circumstances, their participation in the crime, and the possible effects of familial and peer pressure; and (3) how youth impacted any legal defense, as well as any factors suggesting that the child might be rehabilitated. *Id.* at 23 (quoting *Miller*, 567 U.S. at 477).

The *Houston-Sconiers* factors include some of the same factors that the *Miller*-fix statute requires—in particular, the impact of the defendant's age, their childhood and family history, and their prospects for rehabilitation. And in *Houston-Sconiers*, the Supreme Court looked to *Miller* for guidance on how to use judicial discretion to consider youthfulness. *Id.* As a result, we may look to cases involving *Miller* sentencings for guidance in cases applying *Houston-Sconiers* when considering factors that are required in both analyses.

C.      Sentencing Courts Must Fully and Meaningfully Consider Youth

The Supreme Court has recognized that trial courts must have "complete discretion" in considering evidence of "mitigating circumstances associated with . . . youth" and deciding whether to impose an exceptional sentence. *Id.* at 21. Whether conducting a resentencing hearing pursuant to the *Miller*-fix statute or an ordinary juvenile sentencing hearing, trial courts also have an affirmative duty to address the differences between adults and youth and to "fully and meaningfully consider" the "individual circumstances" of the particular juvenile offender. *Solis-Diaz*, 194 Wn. App. at 141; *see also Ramos*, 187 Wn.2d at 434 (requiring courts to "meaningfully consider" relevant differences between juveniles and adults before imposing a "de facto" life sentence); *Houston-Sconiers*, 188 Wn.2d at 19-20 (requiring courts to consider the differences between juveniles and adults before imposing sentences of 26 and 31 years).

Here, the trial court stated its understanding that "*Houston-Sconiers* requires the [c]ourt to consider all of the factors, not just the act itself," and it sentenced Collins while "considering all

of these factors." 2 VRP at 76-77. Since Collins was sentenced, however, *Delbosque* has provided a deeper discussion of *how* some factors common to both *Miller* and *Houston-Sconiers* must be considered.

        1.       First *Houston-Sconiers* factor

First, the sentencing court must consider "age and its 'hallmark features,' such as the juvenile's 'immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). This is similar to the *Miller* sentencing factor regarding "the degree of responsibility the youth was capable of exercising." RCW 10.95.030(3)(b). At Collins's sentencing, the trial court determined that his age, which was 16 at the time of the crime, did not have a significant impact on his actions or interfere with his ability to appreciate risks and consequences.

In *O'Dell*, the Supreme Court remanded for resentencing where the trial court failed to consider the youthfulness of a defendant who had turned 18 a few days before he committed the crime. 183 Wn.2d at 696-97. The court explained, "'[T]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18 [just as] some under 18 have already attained a level of maturity some adults will never reach.'" *Id.* at 695 (second alteration in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). In *Solis-Diaz*, the defendant was 16 years old at the time of the crime, and this court determined that the "same logic and policy" underlying *O'Dell* "would apply with magnified force" where the offender committed their crime as a juvenile. 194 Wn. App. at 138; *see also Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) ("A juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.'" (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (plurality opinion))).

Here, the trial court focused on the insignificance of an 18th birthday when discussing Collins's youth, stating that "nothing miraculous happens on your 18th birthday. You don't suddenly have your brain fully developed so that you're now going to make good choices and now going to be able to assess risks and consequences of your behavior differently than you did the day before you turned 18." 2 VRP at 75. While this assertion is true, this approach fails to "take into account the observations underlying *Miller*, *Graham*, *Roper*, and *O'Dell*," as required by *Solis-Diaz*. 194 Wn. App. at 140. Scientists have "establish[ed] a clear connection between youth and decreased moral culpability for criminal conduct," and courts must take this into consideration at sentencing, even if the defendant is technically over 18. *O'Dell*, 183 Wn.2d at 695. Notably however, Collins did not commit this crime at all close in time to his 18th birthday—he was 16 years old. Therefore, the scientific advancements in understanding youthfulness apply here "with magnified force." *Solis-Diaz*, 194 Wn. App. at 138. The trial court was required to "meaningfully consider whether youth diminished [Collins's] culpability." *Id.* at 139. Its focus on the fact that "nothing miraculous happens on your 18th birthday" was inadequate to satisfy this requirement. 2 VRP at 75.

In determining "whether youth diminished his culpability," it was appropriate for the trial court to consider evidence specific to Collins and the facts of this case. *Solis-Diaz*, 194 Wn. App. at 139. The trial court recognized that Collins held "a loaded gun in [his] hand, and took the magazine out and put it back in." 2 VRP at 75. Based on this conduct, the trial court believed Collins was able to appreciate "the risk associated with that gun and what would happen if [he] pulled the trigger." 2 VRP at 75-76. The trial court's consideration of these specific, relevant facts can properly inform its conclusion on whether youth was a mitigating factor here.

Yet under *Houston-Sconiers*, the trial court must also meaningfully consider relevant mitigation evidence. In *Delbosque*, the Supreme Court noted its concern that the trial court had "oversimplified and sometimes disregarded Delbosque's mitigation evidence." 195 Wn.2d at 118-19. As an example, the court referred to testimony from Dr. Heavin, an expert who testified in support of Delbosque and explained that "'[y]outhfulness, combined with trauma, made [Delbosque] less likely to monitor his own behavior responsibly, inhibit aggressive behavior,' and 'his relative risk taking was greater than a typically developing youth without those same risk factors.'" *Id.* at 119 (internal quotation marks omitted) (quoting *State v. Delbosque*, 6 Wn. App. 2d 407, 411, 430 P.3d 1153 (2018), *rev'd in part by Delbosque*, 195 Wn.2d 106). According to the Supreme Court, the trial court improperly "recharacterized" Dr. Heavin's testimony during sentencing by stating that "'these risk factors had the *potential* for a significant impact,'" whereas Dr. Heavin testified that Delbosque's life experiences "*actually did* have such an impact." *Id.*

At Collins's sentencing hearing, a similar recharacterization occurred. Dr. Gerlock testified that adolescent brains are less developed in the prefrontal cortex, the area responsible for exercising judgment and understanding consequences, and that the prefrontal cortex is "not as active for someone with PTSD." 2 VRP at 47. She also testified that PTSD causes "the part of the brain that stores fear-based memories" to become "more reactive." 2 VRP at 46-47. Dr. Gerlock explained that "those pieces [Collins's adolescence and PTSD] together really compounded his situation in terms of how he perceived the events as they unfolded that night, perceived the situation as threatening, and responded in that reactive impulsive way with lethal violence." 2 VRP at 47.

When sentencing Collins, the trial court described Dr. Gerlock's report as "very interesting" and went on to say, "I don't know. I don't think [Dr. Gerlock] knows. I think that's

why she phrased it [as] what [Collins] may have been experiencing at that time. But the facts as they sound to me don't sound like a person who was in fear for their life." 2 VRP at 74.

Like in *Delbosque*, the trial court "recharacterized" an expert's conclusions. 195 Wn.2d at 119. In its oral ruling, the trial court described Dr. Gerlock's testimony as what Collins "*may have been* experiencing." 2 VRP at 74 (emphasis added). In fact, Dr. Gerlock testified that Collins's adolescence and his PTSD diagnosis "really compounded" to impact how he perceived events prior to the crime, as well as how he responded to those events. 2 VRP at 47; *see also* CP at 408 (describing the effects of adolescence and PTSD on the brain in more detail). Although the trial court does not have to agree with Dr. Gerlock's conclusions, it still must meaningfully consider her actual testimony.

The trial court failed to fully and meaningfully consider the influence of age and its hallmark features, as well as the effects of Collins's PTSD diagnosis, when it focused on the irrelevance of Collins's 18th birthday as a turning point and failed to adequately address expert testimony.

2.      Second *Houston-Sconiers* factor

Second, the sentencing court must consider "the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, and 'the way familial and peer pressures may have affected him.'" *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). This factor is in part comparable to the *Miller* sentencing factor requiring the court to consider "the youth's childhood and life experience." RCW 10.95.030(3)(b).

This court has clarified that "a sentencing court's evaluation of a particular juvenile offender's circumstances must at least extend to an *individualized* assessment of [the] potential

effects of youth." *Solis-Diaz*, 194 Wn. App. at 140 (emphasis added); *see also Ramos*, 187 Wn.2d at 452 ("The court thus addressed three significant gaps between juveniles and adults identified by *Miller as applied to Ramos specifically*." (emphasis added) (internal quotation marks omitted)); *cf. O'Dell*, 183 Wn.2d at 691 ("The legislature has determined that all defendants 18 and over are, *in general*, equally culpable for equivalent crimes. But it could not have considered the particular vulnerabilities . . . of *specific* individuals. The trial court is in the best position to consider those factors." (second emphasis added)). Sentencing courts must consider how an individual's circumstances impacted them specifically.

Here, the trial court was presented with evidence that Collins was exposed to drugs in the womb, placed in foster care as a young child, and abused at a military academy at 12 years old. The trial court reviewed this evidence and shared that "as a human being and as a mother, it's very sad." 2 VRP at 76. The trial court told Collins, "It's very sad that you were exposed to drugs before you even had a chance at a life. It's very sad that you suffered at that academy," and assured Collins that it had "given a great deal of thought" to these facts. *Id.*

Nevertheless, the trial court did not consider how these circumstances affected Collins as an individual. The trial court instead discussed how a person's choices determine their fate, rather than their circumstances. It noted that Parks's son also faced "difficulties" in his life; yet, because Parks's son made "different choices," he was attending university with a scholarship. 2 VRP at 72. In explaining her belief that Collins could have also made "different choices," the trial court reflected, "You know, we have a lot of people, unfortunately, in our society who have mothers who use drugs while they're pregnant, who have terrible things happen to them, being abused or whatever, as they're children." *Id.* The trial court then concluded, "[*T*]*hat's not what this*

14

*proceeding today is about. . . .* This is about accountability under the law for actions that you took."
2 VRP at 73 (emphasis added).

Noting the extent of Collins's participation in the crime, that he was the one out of his group of friends who pulled the trigger, the trial court later stated that it was considering the *Houston-Sconiers* factors "in the context of what brings us all here today, and that is that [Collins] chose to pull the trigger, and a person died as a result." 2 VRP at 76.

It is true that individuals have choices and, at sentencing, the trial court is tasked with determining the appropriate consequences for terrible and tragic choices. Trial courts can and should consider the circumstances of the crime when sentencing any individual, especially the role the defendant played. Yet, the Supreme Court and this court also require consideration of how a specific individual's prior circumstances may have impacted their ability to make good choices. In comparing Collins to Parks's son, and in remarking on the general prevalence of prenatal drug abuse and child abuse in society, the trial court failed to engage in an individualized assessment of how Collins's particular circumstances intersected with his youth and affected his culpability specifically.

The trial court also failed to consider how peer pressure might have affected Collins's actions, especially in light of youthful impulsivity. Collins was with a group of friends when they attempted to rob Parks. After the attempted robbery, one of Collins's friends told him, "Shoot him, shoot him." 2 VRP at 55; *see also* CP at 300. Collins then shot and killed Parks. These circumstances should also be considered as part of the second *Houston-Sconiers* factor.

The trial court failed to expressly address how Collins's environment, family circumstances, and susceptibility to peer pressure may have impacted him and influenced his actions on the day of the shooting. The trial court did not engage in an individualized assessment.

3.      Third *Houston-Sconiers* factor

Finally, the sentencing court must consider "any factors suggesting that the child might be successfully rehabilitated." *Houston-Sconiers*, 188 Wn.2d at 23 (citing *Miller*, 567 U.S. at 477). *Miller* sentencing also requires consideration of "the youth's chances of becoming rehabilitated." RCW 10.95.030(3)(b). The trial court here failed to acknowledge evidence indicating that Collins could be successfully rehabilitated and failed to engage in a forward-looking analysis of his capacity for change.

In *Delbosque*, the Supreme Court expressed concern that the sentencing court's ruling did "little to acknowledge Delbosque's mitigation evidence demonstrating his capacity for change." 195 Wn.2d at 119. The trial court heard testimony regarding Delbosque's qualification for progressively lower security levels, his minimal number of infractions while incarcerated, and his low risk for future dangerousness. *Id.* This testimony was "not addressed" in the sentencing court's analysis, which suggested to the Supreme Court that the sentencing court "did not adequately consider" it. *Id.* at 119-20.

In explaining how courts should consider evidence demonstrating capacity for change, the *Delbosque* court referred to a recent Ninth Circuit case, *United States v. Briones*, 929 F.3d 1057 (9th Cir. 2019). 195 Wn.2d at 121-22. In *Briones*, the Ninth Circuit advised sentencing courts to "'reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history.'" *Id.* at 122 (quoting *Briones*, 929 F.3d at 1066).

At Collins's sentencing, a counselor from Catholic Community Services testified that she had started working with Collins prior to the crime and had been trying to get him "the most intensive services that the County could provide." 2 VRP at 50-51. Although Collins was arrested

16

before he could receive the benefit of these services, the counselor described him as "very receptive to continu[ing] to work with us and to really work on bettering himself." 2 VRP at 51. She ended her testimony by expressing her hope that Collins would take advantage of the programming offered during his incarceration, stating, "I'm sure he will [take advantage of it], because he's been very receptive to the support." *Id.*

Reinforcing this testimony, Collins addressed the trial court and Parks's family with remorse, saying, "I want you to know this: I promise you that with every breath and bone in my body, I will commit to changing my life and myself so that I will never put another family in the spot I have put yours in." 2 VRP at 71. Dr. Gerlock's report also identified specific forms of treatment and therapy that could enable Collins's rehabilitation.

The trial court did not acknowledge any of this forward-looking evidence of Collins's capacity for rehabilitation when issuing its ruling. Summing up, the trial court stated that "considering . . . what is a just punishment, what will be a deterrent, what would it take to rehabilitate [Collins] -- which I honestly didn't hear a lot about -- and how do we protect the public, I do think a sentence within the standard sentencing range is appropriate." 2 VRP at 77. The trial court did not address the counselor's testimony that Collins was receptive to support and to working on himself, Collins's own statements promising a commitment to change, or Dr. Gerlock's expert opinion on beneficial treatment options, all of which leaves this court unable to determine whether this evidence was adequately considered. *See Delbosque*, 195 Wn.2d at 119-20.

Additionally, the trial court stated, "You were previously convicted of a felony offense as a juvenile . . . . So despite the things that were being done for you or with you, you made very bad choices, and continued to make very bad choices." 2 VRP at 74. While the failure to previously

17

take advantage of opportunities for rehabilitation is a factor that may be considered, the trial court must also engage in a forward-looking assessment of Collins's capacity for change, "'rather than a backward-focused review of the defendant's criminal history.'" *Delbosque*, 195 Wn.2d at 122 (quoting *Briones*, 929 F.3d at 1066).

Finally, the trial court told Collins, "You could change. . . . But again, that's one of those choices that you need to make." 2 VRP at 77. The circumstances of Collins's incarceration do create an opportunity for him to change his behaviors, but this statement does not tell us whether the trial court considered his personal capacity for change as part of its sentencing determination.

The trial court failed to expressly consider evidence addressing Collins's capacity for rehabilitation, and it failed to engage in a forward-looking assessment of his capacity for change.

In sum, we recognize that the trial court has broad discretion in imposing an appropriate sentence. But where, as here, the trial court has not fully and meaningfully considered the required *Houston-Sconiers* factors, or has engaged in an analysis that the Supreme Court has since identified as improper, we must reverse. Upon remand, the trial court is free to engage in the sentencing process anew and exercise its broad discretion, so long as it complies with the requirements imposed by the Supreme Court.

## CONCLUSION

We conclude that the trial court failed to fully and meaningfully consider Collins's youth as a mitigating factor during sentencing, as required by *Houston-Sconiers* and now guided by *Delbosque*. We reverse and remand for the trial court to reconsider Collins's youth and resentence him consistent with this opinion. The sentencing court must not impose the criminal filing fee, the DNA collection fee, and the interest accrual provision upon resentencing.

18

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow J.

We concur:

Melnick, J.

Sutton, A.C.J.