393 F.3d 987
 Maximo HILAO, Class Plaintiff, Plaintiff-Appellee,
v.
ESTATE OF Ferdinand MARCOS; Imelda R. Marcos; and Ferdinand R. Marcos, Jr., Defendants-Appellees.
Republic of the Philippines, Real Party in Interest-Appellant.
 No. 03-16934.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 3, 2004.
 Filed December 28, 2004.
 
 Rachel M. Jones and Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, LLP, San Francisco, CA, for the appellant.
 Jon Van Dyke, Honolulu, HI; Robert A. Swift, Kohn, Swift & Graf, PC, Philadelphia, PA, for the plaintiff-appellee.
 William I. Edlund and John J. Bartko, Bartko, Zankel, Tarrant & Miller, San Francisco, CA, for the defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii; Manuel L. Real, District Judge, Presiding. D.C. No. MDL-00840-MLR.
 Before: BRUNETTI, GRABER, and BYBEE, Circuit Judges.
 GRABER, Circuit Judge:
 
 
 1
 The Republic of the Philippines appeals from two orders issued by the district court, even though the Republic is not a party to this litigation. The first "Memorandum and Order" reinstates a 1999 settlement agreement between the Estate of Ferdinand E. Marcos and a class of plaintiffs who had sued the Estate for violations of their human rights. The second "Order Directing Compliance" facilitates the first order by enjoining foreign banks from transferring certain assets that could be used to fund the settlement. The Republic asks us to vacate both orders. But, because the Republic is neither a party to the settlement agreement nor a person or banking institution bound by the Order Directing Compliance, we dismiss its appeal for lack of standing.
 
 BACKGROUND
 
 2
 Before turning to the present dispute, we pause to place it in its historical context.
 
 
 3
 A. The Hilao Litigation and the Abandoned Settlement Agreement
 
 
 4
 Ferdinand Marcos and his family fled to Hawaii in 1986. Almost immediately, several lawsuits were filed on behalf of individuals who had been arrested, tortured, executed, or dis-appeared during Marcos' 15-year tenure as President of the Philippines. Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.) (Estate II), 25 F.3d 1467, 1469 (9th Cir.1994). The Judicial Panel on Multi-District Litigation consolidated all those cases in the District of Hawaii; the consolidated case was later certified as a class action. Id. Ferdinand Marcos died three years after the litigation commenced. In February 1995, the district court entered a final judgment in the class action, approving jury awards of $1.2 billion in exemplary damages and $766 million in compensatory damages against the Marcos Estate. Hilao v. Estate of Ferdinand Marcos (Hilao II), 103 F.3d 767, 772 (9th Cir.1996). We affirmed that judgment. Id. at 787.
 
 
 5
 Collecting that judgment proved exceedingly difficult for the Hilao plaintiff class (who are Plaintiffs in this case) because of two developments. First, to settle a separate suit by the Republic against the Marcos Estate, the Estate agreed to transfer to the Republic the bulk of the portion of the Estate's assets that had been impounded by United States customs officials in Hawaii. Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.) (Estate III), 94 F.3d 539, 542 (9th Cir.1996). Although the district court tried to enjoin the Republic from participating in that transfer, we vacated the injunction to the extent that it purported to enjoin the Republic directly, on the ground of foreign sovereign immunity. Id. at 548.
 
 
 6
 Second, in August 1995 the Republic asked Switzerland's federal government to transfer frozen Estate assets, which were held in Swiss banks, to a Philippine National Bank ("PNB") escrow account. The request was somewhat unusual in that the Republic sought an "early transfer" of assets before a final Philippine-court adjudication of the ownership of those assets. But the Swiss Federal Supreme Court confirmed orders approving the Republic's request in December 1997.
 
 
 7
 Those two developments brought the bulk of the Estate's assets under the Republic's control. Yet Plaintiffs were owed almost $2 billion. As a result of this dilemma, Plaintiffs and the Estate entered into an "Agreement and Compromise" in December 1998 under which the Estate would pay Plaintiffs $150 million to satisfy all claims. To fund the settlement, it was agreed that "[a]ll parties shall make efforts to obtain all necessary consents to trigger release and transfer of the US$150 million from the [PNB] Escrow of the Settlement Fund and shall execute all documents necessary to accomplish the release and transfer."
 
 
 8
 The Republic did not sign, and was not a party to, the settlement agreement. Nonetheless, the chairman of the Philippine Presidential Commission on Good Government ("PCGG"),[1] Magdangal Elma, signed a February 1999 "Undertaking" under which the PCGG would seek to transfer $150 million from the PNB escrow account to the settlement fund. The Undertaking conditioned that transfer on "the approval of the Sandiganbayan[2] and other competent court, and the President of the Republic of the Philippines." On April 29, 1999, the district court granted final approval of the settlement agreement between the Estate and Plaintiffs.
 
 
 9
 In a July 27, 1999, decision, the Sandiganbayan rejected the PCGG's request to transfer $150 million to the settlement fund because, among other reasons, the Sandiganbayan concluded that the settlement was not in Plaintiffs' best interests. That decision left no viable source of funding for the settlement agreement. In light of the parties' failure to acquire settlement funds, the district court terminated the settlement agreement in January 2001.
 
 
 10
 B. The District Court's Past Efforts to Preserve Estate Assets in Connection with the Hilao Litigation
 
 
 11
 Both before and after the parties' attempt to settle the Hilao litigation, the district court took a number of measures to secure funding for the sizable judgment against the Estate. Plaintiffs first moved for a preliminary injunction in November 1991 to prevent the Estate from transferring or secreting any of its assets. We upheld that injunction against a challenge from the Estate. Estate II, 25 F.3d at 1480. When the Estate later settled its dispute with the Republic by agreeing to transfer certain assets to the Republic, the district court modified the injunction to bring the Republic within its scope. We agreed with the Republic that, under the Foreign Sovereign Immunities Act of 1976,[3] it was immune from the district court's jurisdiction. So, as noted above, we vacated the injunction insofar as it purported to enjoin the Republic. Estate III, 94 F.3d at 548.
 
 
 12
 The district court next ordered several Swiss banks to deposit into the court registry "as an interpleader proceeding all [Estate] assets in the possession of the BANKS that are the subject matter of this proceeding." Hilao v. Estate of Marcos (Hilao I), 95 F.3d 848, 851 (9th Cir.1996). We vacated that order, holding that "neither California law nor[Federal Rule of Civil Procedure] 69(a) gave the district court the authority to order the Banks to deposit the contested funds into the court registry." Id. at 856.
 
 
 13
 Undeterred, the district court next entered an identical order, sua sponte, against the Swiss banks in connection with an action that Plaintiffs' lawyer had filed against those banks in Rosales v. Credit Suisse & Swiss Bank Corp., No. CV 96-6419 (C.D.Cal.). The Swiss banks petitioned for a writ of mandamus. We granted the writ in Credit Suisse v. United States District Court, 130 F.3d 1342 (9th Cir.1997). There, we concluded that the act-of-state doctrine prohibited the district court's order in view of the "paradigmatically sovereign" executive orders issued by the Swiss Federal Council, freezing all Estate assets held in Switzerland. Id. at 1347. Consequently, we directed "the district court to refrain from taking any further action in the Rosales action or any other case involving any or all of the Real Parties in Interest[4] and any assets of the Estate of Ferdinand E. Marcos held or claimed to be held by the Banks." Id. at 1348. But we retained jurisdiction and later clarified that the district court could continue to "perform its Rule 23 and/or settlement duties in [the Hilao action] so long as such duties do not involve an attempt to reach Marcos assets held or claimed to be held by the banks,[5] and as long as such duties do not involve taking any further action in the Rosales action." Credit Suisse v. United States Dist. Court, 130 F.3d 1342 (9th Cir.1997) (unpublished order).
 
 
 14
 C. The "Memorandum and Order" and "Order Directing Compliance"
 
 
 15
 While Plaintiffs were attempting to secure Estate assets to fund the judgment that they had obtained, or at least the settlement, in the Hilao litigation, the Republic was pursuing forfeiture proceedings in Philippine courts against the Estate's assets. In July 2003, those proceedings ended in a lengthy Philippine Supreme Court judgment, which concluded that the Estate's assets were "ill-gotten wealth" stolen from the Republic. The Philippine Supreme Court thus granted summary judgment in favor of the Republic and ordered the assets in the PNB escrow account forfeited to the Republic.
 
 
 16
 On September 2, 2003, upon learning of the Philippine Supreme Court's decision and the impending transfer of the Estate's assets, the district court entered sua sponte the "Memorandum and Order" and "Order Directing Compliance" that are at the center of this case. The first order discusses perceived deficiencies in the Philippine Supreme Court decision, as well as the Republic's involvement in the Hilao litigation and settlement proceedings. Its operative text, however, merely reinstates the 1999 settlement agreement between Plaintiffs and the Estate and directs Plaintiffs' lawyer to serve notice of the order, and the accompanying Order Directing Compliance, "on all depository institutions in Singapore[6] and Switzerland, past and present, and counsel for the Republic in the related proceeding pending in this Court, as well as the Swiss government."
 
 
 17
 The Order Directing Compliance notes the "worldwide scope" of the injunction against the dissipation of the Estate's assets[7] and concludes that the injunction would be violated by any transfer of the Estate's assets now held in the PNB escrow account. The operative text states:
 
 
 18
 IT IS HEREBY ORDERED that any such transfer, without first appearing and showing cause in this Court as to how such transfer might occur without violating the Court's injunction shall be considered contempt of the Court's earlier order. Any and all persons and banking institutions participating in such transfers, including but not limited to the Swiss banks, which were the original depository institutions and the depository institutions where the money is currently invested, are hereby notified that such transfer would be considered in contempt of this Court's injunction....
 
 
 19
 The Order Directing Compliance was not entirely successful in preventing the transfer of assets from the PNB escrow account. The Singapore branch of the German bank West Landesbank, which holds $22 million under the PNB escrow agreement, filed an interpleader in Singapore, rather than transferring that sum to the Republic. PNB, however, transferred the escrowed funds it controlled to the Republic. Upon learning of this transfer in February 2004, the district court entered an order requiring PNB to show cause why that transfer did not put PNB in contempt of the injunction. PNB appealed the order to show cause, contesting the validity of the Order Directing Compliance; that separate appeal (No. 04-71843) was submitted to another panel of this court on June 16, 2004.
 
 
 20
 The Republic filed an appeal, challenging the Order Directing Compliance, as well as the Memorandum and Order. It claims that the orders violate our past holdings related to this litigation, the Foreign Sovereign Immunities Act, and the act-of-state doctrine. Although the Republic did not raise those issues — or even appear — before the district court, it now asks us to vacate both orders.
 
 STANDARD OF APPEAL
 
 21
 We review de novo questions of standing. Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co., 257 F.3d 1071, 1075 (9th Cir.2001).
 
 DISCUSSION
 
 22
 We have consistently held that"[a] nonparty has standing to appeal a district court's decision only in exceptional circumstances. We have allowed such an appeal only when (1) the appellant, though not a party, participated in the district court proceedings, and (2) the equities of the case weigh in favor of hearing the appeal." S. Cal. Edison Co. v. Lynch, 307 F.3d 794, 804 (9th Cir.2002) (citations and internal quotation marks omitted). Generally, we have found that equities support nonparty standing when a party "has haled the non-party into the proceeding against his will, and then has attempted to thwart the nonparty's right to appeal by arguing that he lacks standing," SEC v. Wencke, 783 F.2d 829, 834 (9th Cir.1986), or when judgment has been entered against the nonparty, Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1546 (9th Cir.1989).
 
 
 23
 Looking to each order with that standard in mind, we conclude that the Republic does not have standing to bring this appeal.
 
 A. The Memorandum and Order
 
 24
 The Memorandum and Order is the vehicle by which the district court determined to "reinstate" the settlement agreement between Plaintiffs and the Estate. The Republic's request that we vacate that order is perplexing in view of the Republic's insistence, in both its briefing and at oral argument, that it is in no way bound by the agreement. In its opening brief, for example, the Republic observes that the funding of the settlement agreement depended on the acquiescence of the Republic. "The Republic, however, never signed or was a party to the settlement agreement." Similarly, during oral argument, the Republic's lawyer stressed that the PCGG, although it signed the conditional Undertaking, "did not in fact enter into a settlement agreement [with Plaintiffs or the Estate]."
 
 
 25
 A party (or, in this case, a nonparty) is bound by concessions made in its brief or at oral argument. United States v. Crawford, 372 F.3d 1048, 1055 (9th Cir.2004) (en banc), petition for cert. filed, ___ U.S.L.W. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ (U.S. Sept. 15, 2004) (No. 04-6368). In view of the Republic's concession that it is not bound by the settlement agreement, its argument for nonparty appellate standing to challenge that same agreement collapses.
 
 
 26
 We independently agree with that concession because the Republic is required to do nothing under the settlement agreement. At most, the separate Undertaking bound the PCGG to ask the Sandiganbayan to approve a transfer of $150 million from the PNB escrow account to fund the settlement. The PCGG made that request, but the Sandiganbayan refused it. The Republic agreed to nothing more.
 
 
 27
 The district court has taken no steps signaling an intent to bind the Republic to the settlement agreement. In the circumstances, the Republic cannot show that it is prejudiced by the Memorandum and Order, let alone demonstrate that exceptional circumstances or equitable considerations justify nonparty appellate standing.
 
 B. Order Directing Compliance
 
 28
 The Republic contends that the Order Directing Compliance threatens it with contempt in the event that any funds are transferred from Swiss or Singaporean banks to the Republic. The crucial phrase in the order states:
 
 
 29
 Any and all persons and banking institutions participating in such transfers, including but not limited to the Swiss banks, which were the original depository institutions and the depository institutions where the money is currently invested, are hereby notified that such transfer would be considered in contempt of this Court's injunction....
 
 
 30
 The Republic contends that "[a]ny and all persons and banking institutions participating in such transfers," includes the Republic because the Republic "participates" in the "transfers" by receiving the money. We read the order differently. The qualifying phrase — "including but not limited to the Swiss banks, which were the original depository institutions and the depository institutions where the money is currently invested" — casts considerable light on the order's intended effect. The district court clearly sought to bring within the scope of its injunction all financial institutions and escrow agents who handled the funds once they left the Swiss bank accounts. Our reading is consistent with the threatened sanctions against "all persons and banking institutions." (Emphasis added.) Notably absent from that list is the term "countries" or "nations," or any reference to the Republic.
 
 
 31
 Also, the district court's enforcement of its Order Directing Compliance is inconsistent with the Republic's interpretation. After PNB transferred the bulk of the escrowed funds to the Republic, the district court issued an order to show cause against PNB. It did not, however, issue such an order against the Republic or threaten the Republic with contempt sanctions despite its receipt of the funds. In view of the history of this case and the strong wording of the Memorandum and Order, we think it unlikely that the district court voluntarily would have stayed its hand had it intended to bring the Republic within the scope of the order.
 
 
 32
 Reading the Order Directing Compliance in its proper context, the Republic's challenge suffers from the same defect as its challenge to the Memorandum and Order. The present case stands in marked contrast to Estate III, where we held that the Republic had nonparty standing to appeal because
 
 
 33
 [t]he permanent injunction ... finds as a matter of fact that the Republic is "an agent, representative, aider or abettor of the Estate" and expressly enjoins not only the Estate but also "its agents, representatives, aiders and abettors". Thus, the court clearly expressed its view that the injunction binds the Republic.
 
 
 34
 Estate III, 94 F.3d at 544 (emphasis added). By contrast, neither the text of the Order Directing Compliance nor the court's efforts to enforce it suggest that the order binds, or was meant to bind, the Republic.
 
 
 35
 The Republic asserts that the Order Directing Compliance has interfered with its efforts, pursuant to the Philippine Supreme Court judgment, to collect all funds held in the PNB escrow account. As we have noted, one bank has elected to withhold $22 million pending the resolution of an interpleader action in the High Court of Singapore. That inconvenience to the Republic, however, does not rise to the level of an "exceptional circumstance" justifying nonparty standing to appeal. Lynch, 307 F.3d at 804. Were we to hold otherwise, any judgment creditor whose interests may be adversely affected by a district court's decision in wholly separate litigation, to which the creditor is not a party, would have nonparty standing to appeal. We decline to stretch nonparty standing to appeal that far.
 
 CONCLUSION
 
 36
 The Republic is not a party to the settlement agreement that is reinstated by the Memorandum and Order. Nor is the Republic a "person or banking institution" that is threatened with contempt under the Order Directing Compliance. Accordingly, the Republic, as a nonparty, lacks standing to challenge either order in this court.
 
 
 37
 APPEAL DISMISSED.
 
 
 
 Notes:
 
 
 [1]
 The PCGG is an executive agency of the Republic, created by a 1986 executive order, which is charged with recovering "all ill-gotten wealth accumulated by former President Ferdinand E. Marcos" and his associates. Pursuant to the Comprehensive Agrarian Reform Law of 1988, all assets recovered by the PCGG are to be used to fund agrarian reform in the Philippines
 
 
 [2]
 The Sandiganbayan is a special Philippine anti-corruption court with original jurisdiction over much of the Philippine litigation that is related to the Estate's assets
 
 
 [3]
 28 U.S.C. §§ 1330, 1602-1611
 
 
 [4]
 The Real Parties in Interest inCredit Suisse are Plaintiffs in this case.
 
 
 [5]
 The assets held in the Swiss banks have since been transferred to the PNB escrow account
 
 
 [6]
 Although the PNB escrow account is located in the Philippines, some of the Estate's assets formerly held in Switzerland were transferred to financial institutions in Singapore
 
 
 [7]
 We vacated the court's injunction inEstate III only to the extent that it purported to enjoin the Republic. We otherwise left the injunction intact, noting "that the language of the injunction against the Estate prohibits the Estate from concluding an agreement with the Republic, or anyone else for that matter, purporting to transfer Estate assets." Estate III, 94 F.3d at 548 n. 12 (emphasis added).