**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | No. 16-10150 |
| v. | D.C. No. 2:96-cr-00464-DLR-4 |
| RILEY BRIONES, JR., AKA Unknown Spitz, *Defendant-Appellant.* | ORDER AND AMENDED OPINION |

On Remand from the United States Supreme Court

Argued and Submitted September 22, 2021
Pasadena, California

Filed December 6, 2021
Amended June 1, 2022

Before: Diarmuid F. O'Scannlain and Johnnie B. Rawlinson, Circuit Judges, and David A. Ezra,[*] District Judge.

Order;
Opinion by Judge O'Scannlain

---

[*] The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

# SUMMARY[**]

## Criminal

The panel filed (1) an order amending its opinion, denying a petition for panel rehearing, and denying on behalf of the court a petition for rehearing en banc and (2) an amended opinion in which, on remand from the United States Supreme Court, and further remand from the en banc court, the three-judge panel affirmed the district court's imposition of a sentence of life without possibility of parole (LWOP) for crimes committed by Riley Briones, Jr., while a juvenile.

This court affirmed Briones's original life sentence in 1998. Following the Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016) (holding that *Miller*'s rule applied retroactively on collateral review), Briones was resentenced to LWOP in 2016. The three-judge panel affirmed the sentence in *United States v. Briones*, 890 F.3d 811 (9th Cir. 2018). The en banc court subsequently vacated the sentence and remanded in *United States v. Briones*, 929 F.3d 1057 (9th Cir. 2019) (*Briones II*). The Supreme Court remanded for further consideration in light of *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In *Jones*, a case the Supreme Court took for the express purpose of clarifying how to interpret *Miller* and *Montgomery*, the Supreme Court held that in cases involving LWOP defendants, a discretionary system—where a sentencer has considered the defendant's youth and has discretion to impose a lesser sentence than LWOP—is constitutionally sufficient. *Jones* likewise held that permanent incorrigibility is not an eligibility criterion for the imposition of juvenile LWOP sentences, and rejected the argument that a sentencer must at least provide an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility.

Briones argued—relying on the now-vacated en banc decision in *Briones II*—that the resentencing record does not reflect that the district court meaningfully engaged in *Miller*'s central inquiry, namely, identifying those whose crimes reflect permanent incorrigibility. The panel wrote that *Jones* made altogether clear that—irrespective of any seemingly contrary language in *Miller* or *Montgomery*—permanent incorrigibility is not an eligibility criterion for juvenile LWOP.

The panel held that Briones waived his argument that a requirement of meaningful engagement with *Miller*'s central inquiry comes from this court's cases interpreting the federal sentencing statute, 18 U.S.C. § 3553, as to which *Jones* is irrelevant. The panel wrote that Briones's statutory argument would in any event fail on the merits.

The panel rejected Briones's argument that *Briones II* vacated his LWOP sentence for a second, independent reason—namely, that the district court may not have understood it was allowed to meaningfully consider evidence of his post-conviction rehabilitation. The panel wrote that the district court *did* consider Briones's post-

incarceration rehabilitation, and explained that there is no independent statutory requirement that a court imposing juvenile LWOP "meaningfully engage" in a permanent-incorrigibility analysis.

The panel held that Briones waived his as-applied challenge to the substantive proportionality of his sentence, and wrote that all relevant factors militate against exercising discretion to consider the merits of Briones's otherwise-waived substantive disproportionality arguments.

Reviewing for plain error, the panel rejected Briones's wholly speculative arguments advocating for categorical bans on juvenile LWOP.

## COUNSEL

Easha Anand (argued) and Damilola Arowolaju, The Roderick & Solange MacArthur Justice Center, San Francisco, California; Katherine Cion, The Roderick & Solange MacArthur Justice Center, Washington, D.C.; Vikki M. Liles, The Law Office of Vikki M. Liles P.L.C., Phoenix, Arizona; Melanie L. Bostwick and Sheila Baynes, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; for Defendant-Appellant.

Krissa M. Lanham (argued), Assistant United States Attorney; Gary M. Restaino, United States Attorney; Elizabeth A. Strange, Former First Assistant United States Attorney; United States Attorney's Office, Phoenix, Arizona; Patrick J. Schneider, United States Attorney's Office, Flagstaff, Arizona; for Plaintiff-Appellee.

Jon M. Sands, Federal Public Defender; Keith J. Hilzendeger, Assistant Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Amicus Curiae Federal Public Defender for the District of Arizona.

John R. Mills, Phillips Black Inc., Oakland, California; Rebecca Turner, Campaign for Fair Sentencing of Youth, Washington, D.C.; for Amici Curiae Campaign for Fair Sentencing of Youth, and Phillips Black Inc.

**ORDER**

The opinion filed on December 6, 2021, and reported at 18 F.4th 1170 is amended as follows:

At page 1175, delete the following sentence: [In *Jones*, the Court held that in cases involving juvenile LWOP defendants, a "discretionary sentencing system"—where a sentencer can consider the defendant's youth and has discretion to impose a lesser sentence than LWOP—is "constitutionally sufficient."]

Replace the deleted sentence on page 1175 with the following sentence: [In *Jones*, the Court held that in cases involving juvenile LWOP defendants, a "discretionary sentencing system"—where a sentencer has considered the defendant's youth and has discretion to impose a lesser sentence than LWOP—is "constitutionally sufficient."]

With the opinion thus amended, the panel unanimously votes to deny the petition for panel rehearing. Judge Rawlinson votes to deny the petition for rehearing en banc, and Judges O'Scannlain and Ezra so recommend.

The full court has been advised of the petition for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc.  Fed. R.App. P. 35.

The petition for panel rehearing is **DENIED**.  The petition for rehearing en banc is **DENIED**.

No further petitions for panel rehearing or rehearing en banc will be entertained.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a sentence of life imprisonment without possibility of parole imposed on a juvenile is valid after the Supreme Court's recent decision in *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

I

A

Riley Briones, Jr., a Salt River Pima-Maricopa Indian, was a founder and leader of the "Eastside Crips Rolling 30's," a "violent and cold-blooded" gang which, as described by the resentencing judge in this case, "terrorized the Salt River Reservation community and surrounding area for several years." In this role, Briones participated in and helped to plan a series of violent crimes on and around the Salt River Reservation.

The most serious of these crimes was a murder committed on May 15, 1994, when Briones was seventeen

years, eleven months, and eight days old. According to evidence presented at trial, Briones and fellow gang members planned to rob a Subway restaurant, knowing that there would be only one employee present. Briones drove four gang members to the restaurant and parked his car outside while the other four—one of whom was armed with a gun—went in to rob the store. They ordered sandwiches from the lone employee, Brian Patrick Lindsay. While Lindsay was preparing the order, the gunman returned to the car to speak with Briones. Following his conversation with Briones, the gunman went back into the restaurant, shot Lindsay in the face, then shot him several more times as he lay on the floor. With the cash register locked, the gang members were able to steal only the food they had ordered and a bank bag containing $100. After his fellow gang members got back in the car, Briones looked for a maintenance man whom he thought had seen the robbery. Briones instructed the other gang members to shoot the maintenance man on sight, but they never found him.

Three weeks later, Briones helped plan the firebombing of a rival gang member's home and prepared the Molotov cocktails to be used. Briones's fellow gang member then used the Molotov cocktails to set fire to a house with a family (including an eleven-year-old girl) inside. Several months later, the gang decided to try firebombing the same home again. Briones once again provided Molotov cocktails and drove fellow gang members to a kindergarten and an abandoned trailer home to set diversionary fires. Briones then drove them to the rival gang member's home, which they firebombed. Another month later, Briones helped plan a drive-by shooting of the same home, although he was neither the driver nor the shooter.

Over the next year, Briones continued to participate in gang-related crimes, stopping only when he eventually was arrested (at age 19 ½).[1] For instance, when one fellow gang member revealed that he knew about the Subway robbery and Lindsay murder, Briones pistol-whipped him. After other gang members committed another drive-by shooting of a home with a mother and child inside, Briones made sure the culprits disposed of their clothes and accounted for the shell casings. At trial, the Government also presented evidence that Briones had discussed plans to blow up the Salt River Police Department and to kill a tribal judge, federal prosecutors, and Salt River Police investigators.

B

1

As a result of these crimes, Briones was arrested in 1995. In 1996, he and four other members of the Eastside Crips Rolling 30's were indicted on a total of 17 federal charges. Briones, specifically, was indicted for the following: one count of First-Degree Felony Murder on an Indian Reservation (18 U.S.C. §§ 1153, 1111, 2111); four counts of Arson on an Indian Reservation (18 U.S.C. §§ 1153, 81); two counts of Conspiracy to Commit Arson on an Indian Reservation (18 U.S.C. §§ 1153, 371, 81); one count of Possession of an Unregistered Destructive Device (26 U.S.C. §§ 5861(d), 5841, 5871); one count of Assault with a Dangerous Weapon on an Indian Reservation (18 U.S.C. §§ 1153, 113(a)(3)); and one count of Tampering

---

[1] In fact, it appears that Briones continued to participate in gang-related activity, such as carving gang symbols into his jail cell door, even *after* his arrest.

with a Witness (18 U.S.C. § 1512(b)(3)). After a jury trial, Briones was convicted of all such offenses.

At his original sentencing hearing in 1997, Briones continued to deny responsibility for his crimes. The district court found that Briones was the leader of the gang and, on the felony murder count, imposed the then-mandatory Guidelines sentence of life imprisonment without parole ("LWOP"). On the remaining non-homicide counts, Briones was sentenced to a total of twenty years' imprisonment (which he has since served), to run concurrently with his life sentence.

On direct appeal, we affirmed Briones's conviction and sentence. *United States v. Briones*, 165 F.3d 918 (9th Cir. 1998) (unpublished table decision).

## 2

Fifteen years after Briones's original sentencing, the Supreme Court held in *Miller v. Alabama* that "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders" and instead requires that sentencing judges "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. 460, 479–80 (2012) (emphasis added).

After *Miller*, Briones filed a 28 U.S.C. § 2255 motion to vacate his original LWOP sentence and to have it reconsidered at a resentencing hearing where the district court would have discretion—as required under *Miller*—to impose a lesser sentence if deemed appropriate in light of Briones's "youth and attendant characteristics." *Miller*,

567 U.S. at 483. The district court granted such motion in 2014 and ultimately set a resentencing hearing for 2016.

Several months before Briones's resentencing, the Supreme Court handed down *Montgomery v. Louisiana*, which held that *Miller*'s rule applied retroactively on collateral review. 577 U.S. 190, 206, 212 (2016). In dicta, *Montgomery* also appeared to *extend Miller*'s rule, suggesting that LWOP is "an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth," *i.e.*, "for all but . . . those whose crimes reflect permanent incorrigibility." *Id.* at 208–09.

At the 2016 resentencing hearing, Briones's counsel requested a sentence of 360 months' imprisonment, rather than the Guidelines sentence of life imprisonment, for Briones's first-degree felony murder conviction. Invoking the "hallmark[s] of youth" identified by *Miller*, counsel argued that a life sentence was inappropriate in Briones's case, because his gang activity had been a product of youthful immaturity and a desire for the "feeling of banding together." Counsel pointed to a dysfunctional childhood environment, including parental drug and alcohol abuse, a history of family criminality, Briones's dropping out of school in the tenth grade, and his difficulties as a Native American attending school off the reservation where he lived. To mitigate Briones's culpability in the crime, counsel averred that the Subway robbery scheme was not Briones's idea and noted that he was not the shooter. Briones himself told the court that he "want[ed] to express remorse" and "to express grief," although he never actually took responsibility for any of the crimes of which he was convicted. Finally, his counsel pointed to evidence of rehabilitation, including that, in all Briones's time in prison, he never had been written up for a disciplinary infraction, that he had no gang involvement

while in prison, that he had been working continuously, that he had married his girlfriend (with whom he has a now-adult child) after his incarceration, and that he sees his wife regularly.

The Government's counsel countered that Briones still deserved a life sentence. The Government acknowledged that, under *Miller*, "a life sentence for a juvenile is inappropriate in all but the most egregious cases," but argued that Briones's indeed "*is* the most egregious case." While recognizing that Briones was "really doing well in prison," the Government noted that Briones—even as he expressed remorse—had failed to accept responsibility and had continued to minimize his role in the murder and in the gang. Specifically, the Government contended that it was not credible that Briones was unaware of his fellow gang members' intention to murder Lindsay, and that—on the contrary—circumstantial evidence suggested Briones himself may have ordered the murder (insofar as the gunman reentered the restaurant to shoot Lindsay immediately after speaking with Briones outside). The prosecutor described Briones's gang as "the most violent gang that I have ever been involved in prosecuting," including the Hell's Angels. Finally, the Government pointed out that although Briones was a juvenile when the murder occurred, he was only barely so—he was over seventeen years and eleven months old at the time—and that he had continued to commit violent crimes for another year and a half after turning eighteen, stopping only after he was arrested.

After hearing from the parties and "[u]sing the [G]uidelines as a starting point," the district court calculated a sentencing range of life imprisonment for Briones's felony murder conviction, with no objection from counsel. The resentencing judge noted that, "[i]n addition to the

presentence report, I've considered the Government's sentencing memorandum, the defendant's sentencing memorandum[,] . . . the transcript of the [original] sentencing[,] . . . the victim questionnaire and the letters on behalf of [the] defendant." He then found that "[a]ll indications are that [Briones] was bright and articulate, he has improved himself while he's been in prison, but he was the leader of a gang that terrorized the Salt River Reservation community and surrounding area for several years. The gang was violent and cold-blooded." Briones "appeared to be the pillar of strength for the people involved to make sure they executed the plan [to murder Lindsay]," and he "was involved in the final decision to kill the young clerk." The judge explained that "in mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and he's been a model inmate up to now. However, some decisions have lifelong consequences."

Ultimately, the district court announced that, "[h]aving considered those things and all the evidence I've heard today and everything I've read[,] . . . it's the judgment of the Court that Riley Briones, Jr.[,] is hereby committed to the Bureau of Prisons for a sentence of life."[2]

Briones timely appealed to this court.

---

[2] Because the federal system does not permit parole or early release from life sentences, *see* 18 U.S.C. § 3624(b)(1), Briones's sentence is effectively for life without the possibility of parole.

3

Briones filed an Opening Brief raising as his only non-foreclosed argument that "[t]he district court did not properly analyze whether [he] is one of the rare person[s] whose juvenile crimes rendered him 'incorrigible.'" In a published opinion, this three-judge panel affirmed Briones's life sentence. *United States v. Briones*, 890 F.3d 811 (9th Cir. 2018) ("*Briones I*").[3]

After Briones filed a petition for rehearing en banc, this court ordered en banc rehearing and vacated the original three-judge panel's decision. *United States v. Briones*, 915 F.3d 591 (9th Cir. 2019). The en banc panel subsequently vacated Briones's sentence and remanded. *United States v. Briones*, 929 F.3d 1057 (9th Cir. 2019) (en banc) ("*Briones II*").

4

Following the en banc panel's decision in *Briones II*, the Government timely petitioned for certiorari.

During the pendency of such petition, the Supreme Court issued its decision in *Jones v. Mississippi*, a case it had taken for the express purpose of clarifying "how to interpret *Miller* and *Montgomery*." 141 S. Ct. at 1313. In *Jones*, the Court held that in cases involving juvenile LWOP defendants, a "discretionary sentencing system"—where a sentencer has

---

[3] I authored a separate opinion partially concurring in and partially dissenting from the majority opinion in *Briones I*. *See* 890 F.3d at 822–28 (O'Scannlain, J., concurring in part and dissenting in part). However, for the reasons discussed in Parts II and III, *infra*, the concerns expressed in my partial dissent have been mooted by *Jones*'s clarification of *Miller* and *Montgomery*.

considered the defendant's youth and has discretion to impose a lesser sentence than LWOP—is "constitutionally sufficient." *Id.* Likewise, the Court held that "permanent incorrigibility is not an eligibility criterion" for the imposition of juvenile LWOP sentences, *id.* at 1315, and rejected the argument that "a sentencer must at least provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility," *id.* at 1319.

Subsequently, the Supreme Court issued an order granting the Government's petition for certiorari in this case, vacating the en banc decision in *Briones II*, and remanding to this court for further consideration in light of *Jones*. *United States v. Briones*, 141 S. Ct. 2589 (2021).

5

On remand from the Supreme Court, the en banc panel from *Briones II* further remanded the case to this three-judge panel. *United States v. Briones*, 1 F.4th 1204 (9th Cir. 2021) (en banc).

II

A

Briones first argues—relying on the now-vacated en banc decision in *Briones II*—that the resentencing record below does not "reflect that the [district] court meaningfully engaged in *Miller*'s central inquiry," namely, identifying "those whose 'crimes reflect permanent incorrigibility.'" *Briones II*, 929 F.3d at 1061, 1067 (quoting *Montgomery*, 577 U.S. at 209).

*Jones*, however, made clear that the Eighth Amendment requires neither an explicit nor even an *implicit* finding of

permanent incorrigibility. *See* 141 S. Ct. at 1313 ("[A] separate factual finding of permanent incorrigibility is not required."); *id.* at 1319 ("[A]n on-the-record sentencing explanation with an implicit finding of permanent incorrigibility (i) is not necessary to ensure that a sentencer considers a defendant's youth, [and] (ii) is not required by or consistent with *Miller* . . . ."). Rather, *Jones* seized upon *Miller*'s language purporting to "mandate[] 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Id.* at 1311 (quoting *Miller*, 567 U.S. at 483). To that end, *Jones* clarified that a "discretionary sentencing system is both constitutionally necessary *and constitutionally sufficient*," because such discretion "suffices to ensure individualized consideration of a defendant's youth." *Id.* at 1313, 1321 (emphasis added).

Here, the district court plainly considered "youth and its attendant characteristics," *id.* at 1317 (quoting *Montgomery*, 577 U.S. at 210), at Briones's resentencing. Indeed, the resentencing judge explained, on the record, that "in mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs." And as the Government aptly notes, "*Jones* makes clear that in explicitly addressing these items, the district court did *more* than was required, not less." That is because a sentencer with discretion to consider youth "necessarily *will* consider" it, "especially if"—as here—"defense counsel advance[d] an argument based on the defendant's youth." *Id.* at 1319 (emphasis in original).

Nevertheless, Briones now argues that "*Jones* did not purport to change" what he characterizes as *Miller*'s and *Montgomery*'s "central inquiry" into permanent incorrigibility. In support of this contention, he points to *Jones*'s assurance that "[t]he Court's decision today carefully follows both *Miller* and *Montgomery.*" *Id.* at 1321. Such language, Briones urges, must mean that *Jones* left in place *Montgomery*'s dictum that LWOP is "an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth," *i.e.*, "for all but . . . those whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at 208–09.

Yet when the *Jones* Court stated that it was "carefully follow[ing] both *Miller* and *Montgomery*," 141 S. Ct. at 1321, it made clear that it read those cases for far narrower propositions than Briones would have us read them here. *See id.* ("*Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18. Today's decision does not disturb that holding. *Montgomery* later held that *Miller* applies retroactively on collateral review. Today's decision likewise does not disturb that holding."). Indeed, *Jones* made altogether clear that— irrespective of any seemingly contrary language in *Miller* or *Montgomery*—"permanent incorrigibility is not an eligibility criterion" for juvenile LWOP. *Id.* at 1315.

B

Perhaps anticipating *Jones*'s foreclosure of his *constitutional* claim, Briones now argues that "the requirement of 'meaningful engagement'" with what *Briones II* characterized as *Miller*'s central inquiry "comes from this Court's cases interpreting the federal sentencing statute, as to which, of course, *Jones* is irrelevant." *Cf. Briones II*, 929 F.3d at 1067 (citing *United States v. Carty*,

520 F.3d 984, 992 (9th Cir. 2008) (en banc) (applying 18 U.S.C. § 3553)).

As a threshold matter, Briones's statutory argument appears to have been waived twice over. He has waived such argument by failing to raise it in his Opening Brief, *see Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (en banc), and by affirmatively stating at oral argument in *Briones I* that his claim was constitutional rather than statutory, *cf. Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004).

And in any event, Briones's statutory argument would fail on the merits after *Jones*. *Briones II* relied on *Carty* for its holding that "[w]hen a district court sentences a juvenile offender in a case in which an LWOP sentence is possible, the record must reflect that the court meaningfully engaged in *Miller*'s central inquiry." *Briones II*, 929 F.3d at 1067 (citing *Carty*, 520 F.3d at 992). But *Carty* stated only the *general* proposition that "[o]nce the sentence is selected, the district court must explain it sufficiently to permit meaningful appellate review." 520 F.3d at 992. *Carty* does *not* specifically require—or even refer to—the permanent-incorrigibility analysis that Briones charges the district court with failing to perform. Indeed, *Carty* recognized that "[w]hat constitutes a sufficient explanation will necessarily vary depending upon the complexity of the particular case." *Id.*

Here, then, *Briones II*'s application of *Carty* and § 3553 depended on the premise that such an incorrigibility analysis was necessary "to permit meaningful appellate review" of the district court's chosen sentence under then-controlling Eighth Amendment precedents. *Briones II*, 929 F.3d at 1067 (quoting *Carty*, 520 F.3d at 992). But once again, *Jones* rendered such premise untenable when it held that

"permanent incorrigibility is not an eligibility criterion."
141 S. Ct. at 1315.

### III

Next, Briones characterizes *Briones II* as having
"vacated [his LWOP] sentence for a second, independent
reason"[4]—namely, that "the district court may not have
understood it was allowed to meaningfully consider
evidence of [his] post-conviction rehabilitation." *See*
929 F.3d at 1066–67. Briones argues that "[b]ecause *Jones*
had no effect on that portion of [the *Briones II*] opinion, it
should be reinstated."

First, Briones's factual premise is simply false. The
district court *did* consider Briones's post-incarceration
rehabilitation—and explicitly stated as much, noting in its
on-the-record resentencing explanation that Briones had
"been a model inmate" and "improved himself while . . . in
prison."

Moreover, Briones is mistaken to suggest that the
*Briones II* majority's treatment of the rehabilitation-
evidence issue was "independent" of its view that the district
court failed to perform an adequate permanent-
incorrigibility analysis—or that "*Jones* had no effect on that
portion of [the *Briones II*] opinion." The *Briones II* majority
explicitly reasoned that the district court's putative failure to
consider Briones's rehabilitation evidence "require[d]
remand" *because* that "is precisely the sort of evidence of
capacity for change that is key to determining whether a
defendant is *permanently* incorrigible." 929 F.3d at 1067

---

[4] That is, "independent" of the district court's putative failure to
engage meaningfully in a permanent-incorrigibility analysis.

(emphasis in original). But in light of *Jones*'s clarification that "permanent incorrigibility is not an eligibility criterion" for juvenile LWOP, 141 S. Ct. at 1315, the *Briones II* majority's chain of reasoning falls apart.[5] In sum, we conclude that there is no independent statutory requirement that a court imposing juvenile LWOP "meaningfully engage" in a permanent-incorrigibility analysis.

IV

Next, and for the first time in his Supplemental Brief on remand, Briones raises two distinct arguments, each based on a separate line of caselaw, in support of a novel as-applied Eighth Amendment challenge to the substantive proportionality of his sentence.[6]

---

[5] Put slightly differently, *Briones II* appeared to reason that the district court erred by imposing LWOP without making a finding on whether Briones's rehabilitation evidence demonstrated the sort of "capacity for change" that would rule out permanent incorrigibility. 929 F.3d at 1066–67. But of course, the import of such a finding could be only that it might constitute (or at least contribute to) "an 'implicit finding' of permanent incorrigibility." *Jones*, 141 S. Ct. at 1319. And *Jones* flatly "reject[ed]" the argument "that a sentencer must . . . provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility." *Id.*

[6] First, Briones makes what is essentially a substantive version of the procedural argument he has been pressing all along: He relies on *Montgomery* to argue that, insofar as his "crime reflect[ed] transient immaturity" rather than "permanent incorrigibility," his juvenile LWOP sentence is "disproportionate under the Eighth Amendment." 577 U.S. at 209, 211.

Second, Briones argues that his sentence *also* is substantively disproportionate under the framework set forth in Chief Justice Roberts's concurring opinion in *Graham v. Florida*. *See* 560 U.S. 48, 86–96 (2010)

"As a general matter, '[w]e review only issues which are argued specifically and distinctly in a party's opening brief,'" *Devereaux*, 263 F.3d at 1079 (quoting *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)), and as a corollary, "an issue will . . . be deemed waived if it is raised for the first time in a supplemental brief," *id.* (citing *Kreisner v. City of San Diego*, 1 F.3d 775, 778 n.2 (9th Cir. 1993)). Nowhere in his Opening Brief did Briones challenge—or even mention—the substantive proportionality of his sentence. Rather, his only argument (other than those arguments he expressly conceded were "foreclosed," *see infra* Part V) was that the district court committed *procedural* error "by sentencing [him] . . . *without assessing* whether he is one of the rare juveniles who is permanently incorrigible." Accordingly, Briones's as-applied challenge to the substantive proportionality of his sentence is waived.

Moreover, all relevant factors militate against exercising our discretion to consider the merits of Briones's otherwise-waived substantive-disproportionality arguments. Briones has made no attempt to establish "good cause" for his failure to raise such arguments in his Opening Brief, and the Government did not *sua sponte* raise the issue of substantive proportionality in its Answering Brief. *Cf. United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992). Most dispositively, because Briones raises these arguments for the first time in the Supplemental Brief he submitted in response to an order

---

(Roberts, C.J., concurring). Specifically, Briones argues that an examination of his crime of conviction, his sentence, and his characteristics should give rise to "an inference of gross disproportionality," which would be "confirm[ed]" by "intrajurisdictional and interjurisdictional comparisons" between his sentence and other "sentences imposed for the same crime" in the same jurisdiction and other jurisdictions, respectively. *Id.* at 88, 93.

for *simultaneous* briefing, the Government has not had an opportunity to respond to them. As such, the Government surely would be "prejudice[d]," *id.*, if we were to consider either of Briones's novel arguments that his sentence was substantively disproportionate. We therefore decline to reach such arguments.

V

Finally, Briones argues that LWOP is categorically unconstitutional for *any* juvenile offender, or, at least, categorically unconstitutional for juvenile homicide offenders who were not the direct cause of a victim's death.[7]

Because Briones expressly concedes that he "did not specifically object to the imposition of a life sentence" on either of these grounds in the district court, we review for plain error. *See United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc). "An error is plain if it is 'contrary to the law at the time of the appeal.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). And here, Briones also expressly concedes that existing law imposes no categorical ban on LWOP either for juveniles, generally, or for juvenile homicide offenders who did not pull the trigger, more specifically. Effectively, then, Briones has conceded that the district court committed no plain error. We therefore reject his wholly speculative arguments advocating for categorical bans on juvenile LWOP.

---

[7] In his Opening Brief, Briones acknowledged that both of these arguments were "foreclosed" under existing law and that he was raising them only "to preserve [them] for future litigation."

VI

The district court's imposition of a new LWOP sentence at Briones's 2016 resentencing hearing is **AFFIRMED**.